13 N.J. Super. 73 (1951)
80 A.2d 252
JOHN W. CLERKE, PLAINTIFF,
v.
LAWRENCE J. BECK, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided April 10, 1951.
*75 Messrs. Toner, Speakman & Crowley, attorneys for plaintiff.
Miss Beatrice R. Parvin, attorney for defendant.
GRIMSHAW, J.S.C.
The plaintiff, John W. Clerke, is the inventor of a threadless pipe coupling of considerable value. On September 10, 1947, he made application for a patent which was granted during the pendency of the litigation. Both parties claim title to the patent and an adjudication of their respective rights is sought.
The pretrial order limited the issues as follows:
"a. The extent of the interests of the plaintiff and the defendant in the invention and its profits;
"b. The damages suffered by either party as a result of the assertions of the respective claims of interest of the adverse party;
"c. Whether the plaintiff took the items of machinery and chattels as set forth in the counterclaim, or any of them; and
"d. As to those items or chattels and machinery which the plaintiff has in his possession, in whom is the title or the right to possession."
No serious attempt was made by either party to offer proof of damage. And, with the exception of a Logan lathe, to which reference will hereafter be made, the chattels mentioned in issues (c) and (d) have been surrendered to the defendant *76 or are no longer in dispute, so that there remains for determination the extent of the interest of the respective parties in the invention in suit.
Generally speaking, an invention and the resultant patent is the property of the one who conceives and perfects it. And the law will protect the inventor's rights, unless by contract, express or implied, he has bargained away those rights.
The mere fact that an invention was conceived and developed while the inventor was employed by another does not give to the employer any right in or title to the invention. To establish a claim in the absence of an express contract, the employer must show that the inventor was engaged specifically to exercise his inventive faculties for the employer's benefit. Or he must establish the fact that the invention was conceived and developed during working hours with the aid of fellow employees and with the use of the employer's machinery and materials. In the first case, the invention belongs to the employer. In the second instance, the employer has shop rights, i.e., an irrevocable but non-exclusive right to use the invention. Solomons v. United States, 137 U.S. 342 (1890); United States v. Dubilier Condenser Corp., 289 U.S. 178 (1933); Marcalus Manufacturing Co. v. Sullivan, 142 N.J. Eq. 434 (Ch. 1948); International Pulverizing Corp. v. Kidwell, 7 N.J. Super. 345 (Ch. Div. 1950).
The trial of this case took 34 trial days. The record is voluminous and is supplemented by 239 exhibits. It is difficult, therefore, to keep the statement of facts within reasonable bounds.
The plaintiff, John W. Clerke, may be described as a mechanical genius. His formal education was somewhat meager but his practical experience, especially in the automobile and airplane industries, has been wide. Over the course of the years Clerke has been a prolific inventor, having about 100 inventions to his credit.
The defendant Beck is a consulting mechanical engineer. After graduating from college he spent some years in the employ of a utility company in the South. Since then he has been *77 a consulting engineer in New York, save for a short period when he was employed by the New York Park Department.
The two men met in 1939. Clerke at that time was employed by an airplane manufacturer on Long Island, and Beck was engaged in some capacity with the Kincaid Company in New York. During the course of the next two years the acquaintanceship ripened. Beck became a fairly frequent visitor at the Clerke home. Clerke had a shop in the basement of his home, where he worked on his various devices. Here they discussed their mutual interests. Beck described a flame-thrower and muffler of his design, and Clerke told Beck of a welding helmet and various other projects which he had conceived.
In 1941 their paths separated. Clerke went to Baltimore to work in an airplane factory, and Beck became engaged in the production of flame-throwers for the Army, at the plant of the Beattie Manufacturing Company in Little Falls, New Jersey.
The position of Beck in the flame-thrower program was the subject of conflicting testimony. The contract under which the venture was operated was between the Beattie Manufacturing Company on the one hand and a corporation known as Beck Chemical Equipment Corporation on the other. Mr. Brennan, of the Beattie Company, testified that Beck was at the Beattie plant as the representative of the Beck Corporation. Beck, on the other hand, insisted that the venture with Beattie was his private operation and that the Beck Chemical Equipment Corporation was simply his alter ego, used by him for his own convenience. Beck's version of the situation, however, would seem to be incorrect. He and his associates in the Beck Chemical Equipment Corporation became embroiled in litigation in the State of New York, which resulted in a determination by the New York Court of Appeals that Beck's interest in the corporation was only a one-half interest. Pines v. Beck, 300 N.Y. 181.
In any event, when next Beck and Clerke met, in 1943, Beck was devoting his time to the production of flame-throwers at the Beattie plant at Little Falls. Clerke, having returned *78 from Baltimore, was working for the Glidden Buick Company in New York, in its production and engineering department. Several meetings between the two men were held during the fall and winter of 1943. The testimony as to what transpired was conflicting. Clerke testified that Beck evinced considerable interest in a welding helmet of novel design, which Clerke had invented, and suggested a joint enterprise for its production. Beck, on the other hand, stated that Clerke turned over to him the welding helmet, saying that he, Clerke, had no money to expend on its development. Clerke said further, according to Beck's story, that if Beck made a success of the helmet Clerke would be satisfied with whatever Beck gave him in return.
It might be observed, parenthetically, that the motif of trust by Clerke in the generosity of Beck runs through Beck's entire testimony. It creates a picture of childlike credulity which Clerke's appearance on the stand did not support.
Although some drawings of the helmet were given to Beck by Clerke, no commitments were made by either of them until May of 1944. Then, continuing Clerke's recital of events, Beck invited him to visit the flame-thrower operation at the Beattie plant and to discuss matters of mutual interest. The invitation was accepted and on May 14, 1944, Clerke and his wife went to Little Falls.
After an inspection of the flame-thrower operations, Beck entertained the Clerkes at dinner. He then proposed that Clerke should join him in the manufacture of the welding helmet as a joint venture. Clerke was to contribute the helmet and supervise its manufacture. Beck would supply the capital and provide facilities for manufacture. Manufacturing space, he said, was available at the Beattie plant.
Clerke pointed out that he was receiving $8,800 from the Glidden Company and needed the income for the support of his family. Beck then said he would arrange for Clerke to receive $6,000 and would make up the difference in some other way, possibly by means of an expense account. Just how that *79 was to be done was not settled. Ultimately Clerke received $7,000 a year while he was at the Beattie plant.
Beck said, also, that he had some manufacturing problems connected with the flame-thrower program, in the solution of which he would like Clerke's help. To this Clerke agreed.
Clerke joined Beck at the Beattie plant on May 29, 1944. It immediately became apparent that Beck had done nothing to prepare for the development and production of the welding helmet. Neither materials nor space for manufacture were available. To all intents and purposes Clerke became an employee of the flame-thrower venture. His entire time was spent working on that program and his salary was paid by the Beattie Manufacturing Company. Such work as he did on the helmet was done in a shop which he had in the basement of his home.
The war contracts terminated about September 1, 1945, and work on the flame-throwers ceased. Clerke then expected Beck to go forward with the helmet project. Space for manufacturing was still available at the Beattie plant. A model of the helmet had been perfected by Clerke late in 1944. Apparently everything was in readiness. But the capital to finance the venture was not forthcoming. And aside from desultory work on the helmet and various other small articles, nothing was done. Clerke exhibited the helmet to several interested concerns, but no helmets were available for sale.
At the end of 1946, the harmonious relations between Beck and the Beattie Manufacturing Company came to an end. Beck was required to vacate the space in the Beattie plant which he had been occupying Clerke's salary was stopped. The two men had a conference. Clerke suggested that he should get a job. Beck demurred. While he was unable to pay Clerke the salary he had been receiving at the Beattie plant, Beck said he would pay Clerke $100 per week as an advance on the helmet project. They would locate a factory and start work on the helmet in earnest.
A factory in East Hanover was finally leased in the summer of 1947 and the Beck equipment was moved into it. *80 Power was not available for some months and no manufacturing could be done. Clerke, during this period, worked on drawings for improvements to the helmet and on various items devised by Beck. At the same time he was continually urging Beck to obtain the capital necessary for their venture.
On November 11, 1947, still according to Clerke, Beck came to him and admitted defeat. He said that he had been unable to arouse any interest in the welding helmet. He remarked, however, that if he had for development some simple product which could be sold in hardware stores, prospects might be brighter. At this juncture Clerke produced the coupling in suit.
Clerke had invented the pipe coupling in June of 1945 and had reduced it to practice during that year. In January of 1946 he had consulted his patent attorney, Ridsdale Ellis, with the idea of having him determine the patentability of the device. Ellis had a search made and, after further study, decided that the coupling was patentable. Then, since Clerke was short of funds, Ellis suggested that Clerke should explore the market. This was done and the patent application was filed on September 10, 1947. It was this invention, the subject of this litigation, which Clerke showed to Beck in November, 1947.
Clerke told Beck that he was willing to add the coupling to the joint venture but with certain modifications of the original agreement. If Beck manufactured the fitting with capital he had provided, they would share profits equally. But Clerke intended to retain ownership of the patent and of the right to license its use by others. To this Beck agreed.
From money obtained by Beck from a loan on his machinery, patterns and castings of the coupling were made. These Beck showed to various people but failed to arouse any interest. In the spring of 1948, Clerke suggested that contact be made with the Peter A. Frasse Company, a very large distributor of plumbing fixtures. Clerke had already discussed the fitting with them in the latter part of 1946. An appointment was made with Mr. Lennon, one of the executives of the Frasse *81 firm, and Clerke and Beck went to New York to interview him. Mr. Lennon said the Frasse Company would be interested in the fitting, particularly if it could be made in stainless steel, and suggested that models be made in that metal.
Clerke and Beck contacted the Cooper Alloy Foundry Company, which concern manufactured fittings distributed by Frasse. The Cooper Company made some models of the fitting. The two then returned to New York and again met with Lennon and some of his associates. A survey of the field had been made by a Mr. Robbins, an employee of Frasse, and had resulted very favorably. There was considerable interest indicated by retailers and Frasse was prepared to market the fitting when produced. At Clerke's suggestion a letter was addressed to Beck, in which the interest of the Frasse Company in the fitting was expressed, and in which they also indicated their willingness to market the product.
During the summer and early fall of 1948, Beck continued his efforts to raise money but was unsuccessful. Finally Mr. Lennon suggested a meeting with the representatives of the Cooper Alloy Foundry Company. The meeting was arranged for October 1, 1948.
Clerke testified that several days prior to the meeting he and Beck reviewed the situation. Clerke reminded Beck that any interest Beck might have in the fitting was contingent upon his ability to finance its manufacture. And Clerke pointed out that if, as appeared likely, the Cooper Company should propose that they finance as well as manufacture the pipe coupling, then Beck would have no part in the enterprise.
The meeting of October 1, 1948, was attended by Mr. Cooper and other representatives of the Foundry Company; Lennon and other officers of the Frasse Company; Clerke and Beck. There was a discussion of the pipe fitting, during which Cooper and Clerke did most of the talking. Cooper expressed a desire to manufacture the coupling in stainless steel, under a license from Clerke, with Frasse having an exclusive right of distribution. Beck, who had remained silent during the discussion, then expressed his willingness to provide the necessary financial *82 aid. The offer was rejected by Cooper, who said his company would assume that responsibility. It was then arranged that the attorneys for Clerke and the Cooper Company should draw a suitable contract.
Following the meeting, Clerke and Beck again conferred. Clerke told Beck that, in view of the developments, Beck would have no further interest in the fitting. Beck disagreed, and suggested a conference with Ellis. The meeting was held. Ellis told Beck that Clerke owned the invention. Beck declared that he was entitled to a 50 per cent share in the venture. Clerke disagreed, and the meeting ended.
On October 11, 1948, Beck, with his attorney, again met with Ellis, Clerke not being present. Beck at that time offered to purchase the invention but the offer was not accepted.
The proposed contract between Cooper and Clerke was not signed because of claims made by Beck to Cooper and Frasse. Later, however, and just before the trial, Cooper reopened negotiations and an agreement was executed with Clerke, under the terms of which the profits from the sale of the coupling were to be held in escrow pending the outcome of the litigation.
As might be expected, the stories told by Beck and Clerke, while following the same general outline, differed radically in important particulars. Beck denied that there was any understanding in 1947 with reference to the coupling in suit. He based his claim of title to the patent entirely upon the agreement of May, 1944. He testified that primarily he engaged Clerke as an assistant on the flame-thrower project. He told Clerke that during the slack periods which occurred from time to time, Clerke would be expected to work on a post-war development program which Beck had in mind. In this connection it was to be understood, according to Beck, that any invention conceived by Clerke and sponsored by Beck was to be the property of Beck. And any inventions conceived by Clerke which resulted from ideas and directions given by Beck, were also to belong to Beck. Of course, the patents which might result were to be assigned to Beck.
*83 In return, Clerke was to receive a salary of $7,500 and such further sums as Beck saw fit to give him. The amount of such additional payments was to be a matter for Beck's determination. But, as he so modestly put it, Beck would deal liberally with Clerke.
Just why Clerke, in addition to accepting a reduction in salary, should make such a complete surrender of all his rights merely for the privilege of working for Beck, is not satisfactorily explained. Beck's statement that Clerke sought him out is discredited by the testimony of Diehl, a disinterested witness who stated that Beck told him that he, Beck, had been trying for some time, without success, to get Clerke to come to Little Falls. And the suggestion that Clerke was having difficulty with fellow employees at the Glidden Company was negated by the production of a testimonial of affection given Clerke upon his retirement from the Glidden employ.
Beck said that the pipe coupling belonged to him because the idea was his and was given to Clerke to develop. There is no credible evidence in the record which supports this claim. And Beck's uncorroborated statement I am unwilling to accept.
The evidence is overwhelming that no work on the pipe coupling was done at the Beattie plant. Nor, for that matter, was it worked on at East Hanover for more than a year after it was invented. And I am satisfied that for the greater part of that time Beck was not aware of its existence.
There was some work done on couplings in connection with the flame-thrower program. However, they were of a common type readily obtainable on the market. And they had no similarity to the coupling in suit, a fact, apparently, which Beck was unable to appreciate.
I am completely unable to believe Beck's version of his understanding with Clerke. For one reason, the terms he outlined are so incredible that only the most compelling need would explain a man's willingness to give his assent to such an arrangement. And such a need is not shown.
Beck's conduct during the period covered by the various conferences and negotiations and described by a number of *84 witnesses, is entirely inconsistent with the idea of ownership of the patent by him. At no time prior to the litigation did he claim more than an equal right with Clerke to share in the profits of the invention. All the negotiations were carried on by Clerke, who made all arrangements. And Beck, who was always present, never once claimed that the device belonged to him. Even Cone, the Morristown lawyer to whom Beck went for financial aid, and who testified for Beck, said that Clerke was the one who suggested the share of the enterprise which the proposed backer might expect.
Oddly enough, the story of Beck's business activities, as told at the trial, follows a pattern which lends support to Clerke's version of the contract. The agreement between Beck and his associates in the Beck Chemical Equipment Corporation provided that he should furnish the invention and they the finances, with a mutual sharing of the profits. To the same effect was the contract between the Beck Chemical Equipment Corporation and the Beattie Manufacturing Company. And even Diehl, who had a muffler which he sought to develop, testified that he had a similar arrangement with Beck.
The terms of any agreement under which an inventor surrenders his rights in an invention and the resulting patent must be clearly and convincingly proven. And the burden of establishing such an agreement is on the one who asserts it. Eustis Manufacturing Co. v. Eustis, 51 N.J. Eq. 565 (Ch. 1893). In my opinion this burden the defendant Beck has failed to sustain. Even if we disregard the evidence of the other witnesses, Beck's demeanor on the stand, his contradictory testimony, and his refusal to answer directly any questions, furnish eloquent support for his adversary. In fact, I was unable to believe him.
Prior to the hearing there was no allegation of the existence of any shop rights in favor of Beck. During the course of the trial an abortive attempt was made to show that Clerke used materials and tools of the flame-thrower venture in perfecting the pipe coupling. The testimony was not convincing. But assuming for the moment, that the necessary *85 elements to establish shop rights were proven, it is difficult to understand how they could inure to the benefit of the defendant Beck. If Clerke was employed by anyone, he was employed by the joint venture and the parties to that venture were the Beattie Manufacturing Company and the Beck Chemical Equipment Corporation.
The same may be said about the Logan lathe, title to which is in dispute. It was bought from a sub-contractor of the flame-thrower venture, paid for by check of the Beattie Company and shipped to Clerke's home. Clerke testified that he was informed that the cost of the lathe had been charged against his so-called drawing account.
Beck saw the lathe in Clerke's home. He knew that Clerke had presented it to his son as a gift, but Beck never protested. He never included the lathe in the various lists of his equipment prepared in connection with his financial operations. Nor did he ever claim ownership until the litigation started. It may be that Clerke's title to the lathe is defective but it is hard to see how Beck can question that title.
There will be a judgment declaring the plaintiff Clerke to be the owner of the invention in suit and the patent thereon, together with all rights therein, as against the defendant Beck. And as against the defendant Beck, Clerke will be declared to be the owner of the Logan lathe.