CHARLES KINKADE, PLAINTIFF-RESPONDENT, v. NEW YORK SHIPBUILDING CORPORATION, A NEW YORK CORPORATION, DEFENDANT-APPELLANT.

Argued March 19, 1956—Decided April 23, 1956.

*Mr. George D. Rothermel* argued the cause for the appellant.

*Mr. Louis B. LeDuc* argued the cause for the respondent (*Messrs. Dimon, Haines and Bunting,* attorneys).

The opinion of the court was delivered by

OLIPHANT, J. This is an appeal from a judgment of $5,000 of the Superior Court, Law Division, in favor of the plaintiff-respondent, entered on a jury verdict. We certified the case on our own motion. *R. R.* 1:10–1(*a*).

The plaintiff sought damages from the defendant for its use of a simplified method which he designed for the installation of bunk beds on ships being constructed under Federal Government contracts by the defendant. The action

is on an implied contract in the form of *assumpsit* on the theory of unjust enrichment. 1 *Chitty Pleading, p.* \*99; 1 *Tidd's Practice, p.* \*2; *Clark v. Van Cleef,* 75 *N. J. Eq.* 152, 156 (*Ch.* 1908); *cf. Rabinowitz v. Massachusetts Bonding & Insurance Co.,* 119 *N. J. L.* 552, 556 (*E. & A.* 1938); *Matarese v. Moore-McCormack Lines,* 158 *F.* 2d 631, 170 *A. L. R.* 440 (2 *Cir.* 1946). Plaintiff further alleged that he disclosed the invention to authorized agents of defendant in confidence.

Plaintiff was employed by the defendant as a tinsmith. The defendant, the New York Shipbuilding Corporation, was engaged on government contracts of converting three 10,000-ton passenger liners into troop ships. He was employed in a crew whose work was to install the sleeping bunks set up in tiers of three or four. These bunks consist of rectangular iron pipe frames inside of which was laced a length of canvas which supported a mattress and other bunk clothing. In their use position the bunks were at right angles to the bulkhead and parallel with the deck. When not in use the bunks were trussed up so as to provide more gangway for passage through the compartment. They were fastened on one side by a hinge-like arrangement and on the outside the bunks were supported by a metal strap which was attached to the underside of the deck above and on which were eight clips, of which four on each side of the bunk were required to sustain the bunk in the two required positions.

The installation of the bunks by this arrangement was a complicated proceeding except where the installation was along a straight bulkhead. There were innumerable conduits, piping and electric cables which crossed the path where the clips would usually and normally be located, and in such situations the installation of the bunk practically became a handwork job to fit a particular bunk in place. These situations engendered in the mind of the plaintiff the idea that there should be a simpler way to make these installations and he thought considerably about it. One night at home he conceived a very simple idea of re-arranging the hooks

which he sketched out on a small piece of paper. The idea was an extraordinarily simple one and consisted of installing a small hook halfway up a steel strap that held the bunk in a sleeping position and thereby eliminated the necessity for some of the clips and in turn the complication of interference by facilities that ran along the underside of the upper decks.

On each ship there were 566 bunks which meant that some 1,132 clips were required under his improved method as against 4,528 under the old method. There is no question but that the suggestion had a definite financial value to the defendant.

The plaintiff and other of the appellant's employees were paid under an incentive system. Estimators in the engineering department established a time norm or standard for doing a particular job. The men were paid an hourly rate on this basis. If the estimate of the work was three hours and it took eight to do it then the employee received eight hours pay for doing the job, but on the other hand if the estimate was for three hours and the employee accomplished the work in one hour he was paid for three hours. This was referred to as an incentive ticket. Once the company adopted the plaintiff's idea the engineering department made new estimates with the result the incentive tickets of the plaintiff and his fellow employees in the same gang were reduced about two-thirds in amount; at which point the plaintiff complained bitterly to his immediate superiors and asked what he was going to get out of all of this.

It is obvious that these changes in the estimates of the time required to do the work reflected a large saving in labor costs in the installation of the bunks and were the end product and result of the idea and design of the plaintiff. So from this standpoint the refusal of the defendant to share a part of this gain with the plaintiff seemingly is inequitable. But there are countervailing equities arising from the employer-employee relationship which support the position of the defendant. An action of *assumpsit* is based upon an implied obligation and it is determined on the

controlling equitable principles applicable to all the rights and co-relative duties inherent in a specific situation. *Republic of China v. Pong Tsu Mow,* 15 *N. J.* 139, 147 (1954); *Capraro v. Propati,* 127 *N. J. Eq.* 419 (*E. & A.* 1940); *Hartford Accident & Indemnity Co. v. Benevento,* 133 *N. J. L.* 315 (*E. & A.* 1945).

Turning back to the point where the plaintiff had reduced his idea to a sketch on a small piece of paper, when he returned to the plant the following day he showed the design to his helper and then he took it to the shop supervisor who said "It was a good idea and they would use it on the next ship." He then spoke to the general foreman of the tinshop who said if the supervisor liked it, it was O.K. He also spoke to the government man on the job. Then his sub-foreman told him to go to the tinshop with his helper where they made up a sample of the installation and they took it and installed it on the aft end of the ship, but as that ship was nearly finished this was apparently the only one that was installed on it.

The plaintiff testified it only took a couple of minutes to make the device; that it was made with company materials and on company time and apparently thereafter the straps with the hooks fashioned according to the invention were made in the same tinshop by company employees and installed by company employees. Up to this point nothing was said by the plaintiff to any of his immediate superiors regarding remuneration, but when work was started on the next two ships known as Ships Nos. 486 and 487 the new method was used and the new estimates of time went into effect and then it was that the plaintiff became aware of the cut in his pay incentive tickets and raised the question as to "What am I going to get out of it?" He then saw the outfitting superintendent and the assistant works manager who referred him back to his outfitting superintendent who flatly stated "I cannot make an exception out of you and leave your ticket at the original price and cut the rest of them. You will have to take the cut the same as the rest of the fellows." He then saw the union delegate who

refused to take up the cudgels for him in the dispute on the ground the situation was one not covered by the union contract.

There is also some vague evidence that the defendant had some plan for paying specified awards to employees who suggested ideas that cut costs or speeded the work. Even when the plaintiff sought redress in this direction he received only vague, non-committal answers. After being shunted from pillar to post, the end result of all this was that all the plaintiff got for his very practical and workable idea was a substantial cut in pay and hence this suit.

The defendant contended and offered proof at the trial that the idea of the plaintiff was not a novel process or design and further that it was merely a variation of a pre-existing design by another employee, one Bohn. The improved design was novel and the epitome of simplicity and the same could not be said of the standard design being used by the company. Although there was some similarity between plaintiff's design and that of Bohn, there were definitely marked differences and Bohn's design was never adopted while the plaintiff's was, since it was superior and effective.

In view of the inequitable result insofar as the plaintiff's income was concerned, we have minutely and carefully examined the record in this case yet we failed to find any facts establishing or from which an inference could arise that any person employed by the defendant having the requisite official authority indicated or promised, either directly or impliedly, that the defendant would pay plaintiff for the use of the design.

The defendant-appellant's first point is that the plaintiff's design was not a novel or secret design or process and secondly argues there was no disclosure of the plaintiff's design in confidence to a duly authorized agent of the defendant. And thirdly there was a publication by the plaintiff of his design that precluded the rationale of our decision in *Sun Dial Corp. v. Rideout*, 16 *N. J.* 252 (1954), from being applicable here.

■ We are convinced that the design was novel and original and further we do not agree there was sufficient publication to remove the veil of secrecy and thus put it in the public domain. The plaintiff's disclosure of his invention was limited to a relatively few persons. Besides his helper, the disclosure was made to those of his superiors who would be called on to pass upon the efficiency and usefulness of the design. Such disclosure was necessary for without such there could have been no use of the design by the defendant. However, we do not consider the facts here can be disposed of by the principles applicable to trade secrets but rather it is controlled by the rule or principle popularly referred to as the "shop right rule."

■ Our cases hold that one who invents a process of manufacture or design, whether patentable or not, has property therein which the courts will protect against any one who, in violation of the contract or through breach of the contract, undertakes to apply the secrets of another to his own use. *Salomon v. Hertz,* 40 *N. J. Eq.* 400 (*Ch.* 1885); *Club Razor & Blade Mfg. Corp. v. Bindzsus,* 131 *N. J. Eq.* 283 (*Ch.* 1942), affirmed 133 *N. J. Eq.* 38 (*E. & A.* 1943). On this basic premise our cases further hold the mere fact that an invention was conceived and developed while the inventor was employed by another does not give to the employer any right in or title to the invention. To establish a claim in the absence of an express contract, the employer must show that the inventor was engaged specifically to exercise his inventive faculties for the employer's benefit. Or he must establish the fact that the invention was conceived and developed during working hours with the aid of fellow employees and with the use of the employer's machinery and materials. In the first case the invention belongs to the employer; in the second instance, and this is the "shop right rule," the employer has an irrevocable but non-exclusive right to the invention. This rule is embedded and firmly established as a matter of principle in the law of the land. *Clerke v. Beck,* 13 *N. J. Super.* 73 (*Ch.* 1951); *Solomons v. United States,* 137

*U. S.* 342, 11 *S. Ct.* 88, 34 *L. Ed.* 667 (1890); *United States v. Dubilier Condenser Corp.*, 289 *U. S.* 178, 53 *S. Ct.* 554, 77 *L. Ed.* 1114, 85 *A. L. R.* 1488; 4 *Williston Contracts* (*rev. ed.*), sec. 1025A, p. 2835; *Restatement of Agency*, sec. 397(*b*); *National Development Co. v. Gray*, 316 *Mass.* 240, 55 *N. E.* 2d 783, 153 *A. L. R.* 973, 1002; 35 *Am. Jur.*, sec. 95, p. 523; 39 *C. J.*, sec. 167, p. 128; 56 *C. J. S., Master and Servant*, § 73. See notes 28 *Texas Law Review* 728 and 22 *Minn. Law Review* 115. *Cf.* and see cases cited in *Connelly Mfg. Co. v. Wattles*, 49 *N. J. Eq.* 92 (*Ch.* 1891); *International Pulverizing Corp. v. Kidwell*, 7 *N. J. Super.* 345 (*Ch. Div.* 1950); *Marcalus Mfg. Co. v. Sullivan*, 142 *N. J. Eq.* 434, 439 (*Ch.* 1948).

While the claim of the plaintiff here is *bona fide,* the "shop right rule" came into being and was aimed at a mischief of employees alleging spurious claims of inventions or novel ideas against the masters and employers occurring during the regular course of their work. The rationale of the rule and its underlying distinctions were clearly stated by Mr. Justice Roberts in *United States v. Dubilier Condenser Corp., supra,* 289 *U. S.,* at *page* 188, 53 *S. Ct.,* at *page* 557, where he said:

"The reluctance of courts to imply or infer an agreement by the employee to assign his patent is due to a recognition of the peculiar nature of the act of invention, which consists neither in finding out the laws of nature, nor in fruitful research as to the operation of natural laws, but in discovering how those laws may be utilized or applied for some beneficial purpose, by a process, a device, or a machine. It is the result of an inventive act, the birth of an idea and its reduction to practice; the product of original thought; a concept demonstrated to be true by practical application or embodiment in tangible form. \* \* \*

Though the mental concept is embodied or realized in a mechanism or a physical or chemical aggregate, the embodiment is not the invention and is not the subject of a patent. This distinction between the idea and its application in practice is the basis of the rule that employment merely to design or to construct or to devise methods of manufacture is not the same as employment to invent. Recognition of the nature of the act of invention also defines the limits of the so-called shop right, which, shortly stated, is that, where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he

obtains a patent, he must accord his master a nonexclusive right to practice the invention. * * * This is an application of equitable principles. Since the servant uses his master's time, facilities, and materials to attain a concrete result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business. But the employer in such a case has no equity to demand a conveyance of the invention, which is the original conception of the employee alone, in which the employer had no part. This remains the property of him who conceived it, together with the right conferred by the patent, to exclude all others than the employer from the accruing benefits. These principles are settled as respects private employment."

 It is for these reasons that the employer has an irrevocable but non-exclusive right to use the invention. Since the proof in this case is clear that while the employee conceived the idea at his home, the actual material used and the work was done at the employer's shop on the employer's time, and this being so, under the rule, the defendant acquired shop rights in the invention or design which gave it an irrevocable but non-exclusive right to use the invention. We are not called upon to decide the question whether or not the idea is patentable on behalf of the plaintiff.

Of course all these cases depend on their own particular facts, but the plaintiff relies principally on the case of *Matarese v. Moore-McCormack Lines, supra.* That case is clearly distinguishable, for there there was evidence that after the employee had built the model at home on his own time he then explained and demonstrated and showed a model to the employer's superintendent, and the latter authorized him to construct the device, a loading pallet, using the employer's workmen and materials, that this pallet was demonstrated on the pier in the presence of the superintendent, officials and foremen. He was then directed to go ahead with the manufacture of the pallets, something which he previously had nothing to do with, and after that he went to work full time for the defendants. All of these acts had been observed and aquiesced in by the executive vice-president of the employer. There was definite proof of a promise of compensation and additional facts from which

a similar promise could be implied, and there was ample evidence from which authority to make such promises could also be implied.

The *Matarese* case comes within the line of cases headed by *Heywood-Wakefield Co. v. Small*, 87 *F.* 2d 716 (1 *Cir.* 1937), which states the rule to be that when an employee makes an invention on his own time at his own expense and allows its manufacture by his employer purely to satisfy the latter that it meets his needs, the employer gains no shop right thereby. But that is not the situation here where the employee on his own time only had the abstract idea which he reduced to crude design on a small piece of paper but the actual manufacture of the device was done with company materials by him and fellow employees at the company's time and expense.

We are compelled to the conclusion that the plaintiff failed to maintain his burden of proof to establish an express or implied promise to compensate him for the use of his design and invention. This being so the situation is controlled by the "shop right rule" as defined above.

The judgment below is reversed and judgment entered in favor of the defendant-appellant and against the plaintiff-respondent. No costs.

*For reversal*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD and BURLING—4.

*For affirmance*—Justices HEHER, JACOBS and BRENNAN—3.