688 A.2d 130

DAVID KOPIN, PLAINTIFF–APPELLANT, v. ORANGE PRODUCTS, INC., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 19, 1996—Decided February 10, 1997.

354

356

Before Judges MICHELS, MUIR, Jr. and COBURN.

*Judson A. Parsons, Jr.* argued the cause for appellant.

*James A. Plaisted* argued the cause for respondent (*Walder, Sondak & Brogan*, attorneys; *Mr. Plaisted*, of counsel and on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

The plaintiff David Kopin appeals from a summary judgment of the Law Division in favor of defendant Orange Products, Inc. that dismissed his action to recover damages on a theory of *quantum meruit* for business suggestions he made while employed by defendant.

Accepting plaintiff's proofs presented on the summary judgment motion, it appears that defendant was in the business of manufacturing plastic balls used in roll-on deodorants. Defendant built its own grinding machines to produce the balls. Plaintiff's principal responsibility was to make, install, repair, and replace the various sized grinding wheels used in the grinders to shape the plastic balls. On occasion, plaintiff made other parts for the machines and worked as a machinist. While plaintiff admits that it was part of his job to improve his efficiency and techniques as a machinist, he claims that before March 1986 he never created any major improvements or designs for the grinding machines. Instead, he contends that he only made minor improvements that increased the quality of his work. Plaintiff maintains that significant alterations to the grinders were the engineer's responsibility and never part of his job requirements.

Plaintiff, however, admits recommending some major changes regarding the grinding machines prior to March 1986. For instance, in 1977 plaintiff suggested that certain parts for the grinders be made of stainless steel so that they would last longer. Plaintiff notes that at the time he did not expect extra remuneration because he had never been promised any extra compensation for his suggestions; he felt that the suggestions made his position more secure and were actually part of his job. Additionally, in 1977 or 1978, plaintiff suggested two other major modifications: a new flange design for the big grinders and a new holder for certain "worm" gears on the grinders. According to plaintiff, his supervisor told him that he should just worry about the grinding wheels and let the supervisor worry about the machines. Plaintiff interpreted the supervisor's comments as instructing him not to make any more recommendations; hence, plaintiff stopped making such suggestions after 1978.

In March 1986, defendant was purchased by S. Paul Sachdev and Mario Verdi. Soon after acquiring defendant, Sachdev and Verdi held a meeting with plaintiff and other employees. According to plaintiff, Verdi declared at the meeting that

if anybody ... come[s] to us [Sachdev and Verdi] and make[s] an improvement to our operation, or how we can make more money, or what we can do with the equipment and we use it and it works for us [that person will] be financially remunerated.

According to plaintiff, Verdi motioned to the maintenance man to emphasize his point, stating, "If Bob[,the maintenance man,] comes up with the idea ... he will be rewarded." Diane Furey Whitehead, a machinist who was at the meeting, reported that her father, a supervisor with defendant, asked Sachdev if this promise was true, and Sachdev replied, "Yes, you would be taken care of." Throughout the remainder of plaintiff's employment, Sachdev and Verdi never retracted this offer. Neither owner, however, ever stated what remuneration an employee would receive for a useful suggestion.

Soon after the meeting, Sachdev and Verdi fired plaintiff since they believed that plaintiff's work did not require a full-time employee and that such work could be assimilated into another employee's duties. Yet, it was soon determined that another person could not be trained to do plaintiff's work and that no other employee was willing to do it. Thus, defendant rehired plaintiff.

In late 1986 or early 1987, plaintiff suggested to his supervisor that the flange design used on smaller grinders be adopted for the larger grinders. Plaintiff thought that the new flange design would prevent the water used in operating the grinders from coming in contact with the bearings, and thereby prevent the bearings from wearing out as quickly. Plaintiff presented this idea to his supervisor and one of the owners for months before they finally decided to try the new flange. First, the flange was tried on only one large grinder, and defendant discovered that the bearings lasted about four times longer than before. Then, after several more months, defendant changed the flanges on all the large grinders so that by the middle of 1988 each had the new flange.

Plaintiff claims that the new flange produced three benefits for defendant. First, it reduced labor and parts costs since the bearings were changed less frequently. Second, it extended the

lives of the grinding wheels. And, third, it increased the production of plastic balls since the machines did not need to be fixed as often. Plaintiff contends that as a result of this suggestion, defendant's sales were greatly increased because production was dramatically increased.

In 1989, plaintiff recommended to defendant a new feeding hopper design for the large grinders. The hoppers were devices attached to the grinders through which plastic blanks, the raw material which was eventually ground into plastic balls, were fed into the grinder. The hoppers had seven openings, but the blanks were slightly larger than the openings, so that blanks would get caught in them. Consequently, only three to six blanks, rather than seven, would fall in at a time. As a result, less balls were produced and the life of the grinding wheels were reduced due to uneven wear. In addition, the seven openings could not be further enlarged since they were too close together. Plaintiff proposed that a new hopper with six larger openings be built. Defendant adopted plaintiff's suggestion in September of 1989 and, according to plaintiff, was again able to increase its plastic ball production and profits.

In late 1989 or early 1990, plaintiff suggested that a mounting device for a worm gear, which frequently broke, be replaced with an inexpensive, sturdy screw. Plaintiff claims that this suggestion increased profits by saving substantial labor and parts costs. Plaintiff also suggested that the large grinders use heat-treated gear teeth. These sturdier teeth were used. Plaintiff asserts that this suggestion saved defendant money because the machines needed less repair.

Further, defendant adopted plaintiff's suggestion that a silicone compound be spread over the bearings to prevent any moisture from reaching the bearings. Plaintiff contends that this advice also helped defendant increase production. Finally, plaintiff submitted two further improvements which defendant accepted. First, he designed a device which made the heads on the grinders interchangeable and, thus, easier to replace when broken. Sec-

ond, he replaced an air mechanism which controlled the opening and closing of the hoppers with latches, a mechanical device which was more dependable. There was also evidence that prior to implementing plaintiff's suggestions, defendant's maximum output per shift was forty-nine drums of plastic balls, and that as a result of plaintiff's recommendations, production increased to seventy-one drums per shift and saved defendant labor and material costs.

Defendant, on the other hand, claims that plaintiff's suggestions did not lead to any increased profits. Instead, Sachdev attributes defendant's success to a lapper, a new product purchased in 1991 which allegedly helped produce more acceptable plastic balls. Sachdev contends that prior to plaintiff's suggestions, plaintiff's grinding department accommodated all the balls produced by the seal-welding and molding departments. Thus, defendant maintains that any improvements in the grinding department did not increase its actual output since the grinding section was already producing more balls than the other sections could provide prior to plaintiff's recommendations. Sachdev, however, did add a third shift to the grinding department in 1990. Finally, Sachdev claims that defendant lost more than $800,000 between 1986 and 1989.

While employed by defendant, plaintiff was paid his agreed upon wages and received regular pay increases. Plaintiff also received bonuses at the end of every year in the amount of $100 as well as payments of $1,500 in a few years in lieu of participating in a pension plan. Plaintiff suggests that most employees received the same yearly bonuses even though they did not make helpful recommendations.

Prior to 1991, plaintiff never mentioned to Sachdev or Verdi that he wanted any financial remuneration for his suggestions. Plaintiff states that he hesitated approaching Sachdev or Verdi directly because he was afraid of retaliation. Nevertheless, plaintiff claims that he told his supervisor on several occasions that he (plaintiff) should receive some reward for his suggestions. Plaintiff asserts that when he told his supervisor of his desire for

financial compensation, his supervisor responded, "[T]alk to Paul [Sachdev] about it." The supervisor, however, denies that plaintiff ever spoke to him about compensation.

, In the spring of 1991, plaintiff confronted Sachdev regarding remuneration, but Sachdev dismissed the matter summarily. In the summer of the same year, plaintiff resigned because defendant relocated to Allentown, Pennsylvania and the commute was too far. In November of 1991, plaintiff notified Sachdev in writing that he expected compensation for the suggestions he had made.

In July 1991, plaintiff filed a wage claim against defendant with the Department of Labor. Plaintiff claimed that the overtime he worked entitled him to time-and-half pay, rather than the straight-time pay he had received. In October 1992, plaintiff settled with defendant and dismissed the wage claim.

In January 1992, plaintiff instituted this action against defendant in the Law Division. In the complaint, plaintiff alleged that defendant breached a contract with him by not paying him "substantial financial rewards" for his recommendations which led to defendant's increased productivity. In August 1992, the trial court granted summary judgment in favor of defendant, finding that the contract lacked specificity since it did not indicate the amount to be paid or the method to calculate payment. Plaintiff appealed but did not challenge the summary judgment in favor of defendant on the express contract claim. Rather, plaintiff sought a reversal of the summary judgment and a remand for trial on the ground that he was entitled to recover damages under a *quantum meruit* theory. In March 1994, in an unpublished opinion, *Kopin v. Orange Prod., Inc.,* No. A–1268–92T3 (N.J.App.Div. March 23, 1994), we remanded the matter to the trial court to permit plaintiff to amend his complaint to include a claim of *quasi*-contract and *quantum meruit* and afforded the parties a reasonable time to complete pretrial discovery. In July 1994, the Supreme Court denied certification. *Kopin v. Orange Prod., Inc.,* 137 *N.J.* 315, 645 *A.*2d 143 (1994).

In March 1994, plaintiff filed an amended complaint, asserting a *quasi*-contract and a *quantum meruit* claim. After issue was joined, defendant again moved for summary judgment on the ground that plaintiff's *quantum meruit* claim was barred by the shop right rule as discussed in *Crowe v. M & M/Mars*, 242 *N.J.Super.* 592, 577 *A.*2d 1278 (App.Div.), *certif. denied*, 122 *N.J.* 387, 585 *A.*2d 389 (1990). The trial court agreed and granted the motion. The trial court reasoned that the shop right rule was applicable because (1) plaintiff conceived and developed his improvement to the grinders primarily during working hours while employed by defendant and (2) plaintiff used defendant's materials and machinery to develop the improvements. On plaintiff's motion for reconsideration, the trial court reaffirmed its prior decision, finding that plaintiff was paid his salary and bonuses during his employment with defendant and, therefore, there was no basis to conclude that defendant was unjustly enriched. The trial court also held that the claim was barred by laches because defendant had destroyed some of its records and by the entire controversy doctrine because plaintiff failed to raise the issue of a right to further compensation for his suggestions in his prior wage claim against defendant filed with the Department of Labor. Plaintiff appealed.

Plaintiff seeks a reversal of the summary judgment and remand for trial on his *quasi*-contract/*quantum meruit* claim. He contends that (1) he presented sufficient proofs to make a prima facie case on his *quantum meruit* claim; (2) his claim is not barred by the shop right rule because defendant promised to pay him extra money for his suggestions; (3) his claim is not barred by laches in that (a) he did not delay unreasonably before making his claim, (b) defendant should not benefit from destroying its records, and (c) he had no obligation to keep better records; (4) his claim is not barred by the entire controversy doctrine; and (5) he had not completed pretrial discovery of defendant's books and records and is entitled to do so.

## I.

*R.* 4:46–2(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." *See also Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 528–29, 666 *A.*2d 146 (1995); *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N.J.* 67, 73–75, 110 *A.*2d 24 (1954). "[W]hether there exists a 'genuine issue' of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Brill v. Guardian Life Ins. Co. of Am., supra,* 142 *N.J.* at 540, 666 *A.*2d 146. Thus, "where the party opposing summary judgment points only to disputed issues of fact that are 'of an insubstantial nature,' the proper disposition is summary judgment." *Id.* at 529, 666 *A.*2d 146 (quoting *Judson v. Peoples Bank & Trust Co. of Westfield, supra,* 17 *N.J.* at 75, 110 *A.*2d 24).

Further, in determining whether a genuine issue of material fact exists, the motion judge should engage in an analytical process essentially the same as that used in ruling on motions for judgment made under *R.* 4:37–2(b), *R.* 4:40–1, and *R.* 4:40–2. *Id.* at 535–37, 666 *A.*2d 146. The only difference between motions for judgment and motions for summary judgment is that the summary judgment motions are generally decided on documentary evidence, rather than on evidence presented at trial. *Id.* at 536, 666 *A.*2d 146. However, the essential issue remains the same: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Ibid.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 *U.S.* 242, 251–52, 106 *S.Ct.* 2505, 2512, 91 *L.Ed.*2d 202, 214 (1986)).

 Nevertheless, the motion judge does not make credibility determinations and must afford the opponent of the summary judgment motion all favorable inferences. *Id.* at 536, 540, 666 *A.*2d 146. If a case, however, presents no material factual disputes, the court simply applies the appropriate law to the facts. *Id.* at 537, 666 *A.*2d 146. In addition, in determining the summary judgment motion, the motion judge must use the same evidentiary standard of proof that would apply at trial on the merits. *Id.* at 533–34, 666 *A.*2d 146. On appeal, we apply the same standards. *McClelland v. Tucker*, 273 *N.J.Super.* 410, 415, 642 *A.*2d 409 (App.Div.1994).

 In light of these standards, we are satisfied that there were genuine issues of material fact raised that precluded the granting of summary judgment as to plaintiff's *quasi*-contract/*quantum meruit* claim. *Quasi*-contracts are imposed by law to bring about justice, without reference to the parties' intent. *St. Paul Fire and Marine Ins. Co. v. Indemnity Ins. Co. of N. Am.*, 32 *N.J.* 17, 22, 158 *A.*2d 825 (1960). *See also Bloomgarden v. Coyer*, 479 *F.*2d 201, 210 (D.C.Cir.1973) ("The *quasi*-contract . . . is not really a contract, but a legal obligation closely akin to a duty to make restitution. . . . [A] *quasi*-contract . . . will be recognized in appropriate circumstances, even though no intention of the parties to bind themselves contractually can be discerned." (footnotes omitted)). "They 'rest on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. . . .'" *St. Paul Fire and Marine Ins. Co. v. Indemnity Ins. Co. of N. Am., supra,* 32 *N.J.* at 22, 158 *A.*2d 825 (citation omitted). "In the case of actual contracts the agreement defines the duty, while in the case of *quasi*-contracts the duty defines the contract." *Callano v. Oakwood Park Homes Corp.*, 91 *N.J.Super.* 105, 108, 219 *A.*2d 332 (App.Div.1966).

 Whenever a *quasi*-contract theory has been successfully advanced, it has been shown "that the plaintiff expected remuneration from the defendant, or if the true facts were known to plaintiff, he would have expected remuneration from defendant, at

the time the benefit was conferred." *Id.* at 109, 219 *A.*2d 332. Accordingly, a plaintiff presents a successful *quasi*-contract claim if he/she can demonstrate "that defendant received a benefit from plaintiff which it is unjust for [defendant] to retain without compensation, and that plaintiff, in conferring the benefit, expected remuneration." *Cohen v. Home Ins. Co.*, 230 *N.J.Super.* 72, 82, 552 *A.*2d 654 (App.Div.1989).

Thus, in a *quasi*-contract claim, defendant must have been unjustly enriched. As the *Callano* court emphasized: "The key words are *enrich* and *unjustly*. To recover on the theory of *quasi*-contract the plaintiffs must prove that defendant … received a benefit, and that retention of the benefit without payment therefor would be unjust." *Callano v. Oakwood Park Homes Corp., supra,* 91 *N.J.Super.* at 109, 219 *A.*2d 332. *See also Shalita v. Township of Washington,* 270 *N.J.Super.* 84, 90, 636 *A.*2d 568 (App.Div.1994) ("[A] *quasi*-contract rests on the equitable principle that a person should not be allowed to enrich himself unjustly at the expense of another."). In addition, the party conferring the benefit must have expected remuneration. *See Cohen v. Home Ins. Co., supra,* 230 *N.J.Super.* at 82, 552 *A.*2d 654.

■■■■ *Quantum meruit* is a form of *quasi*-contract, *Weichert Co. Realtors v. Ryan,* 128 *N.J.* 427, 437–38, 608 *A.*2d 280 (1992), which means " 'as much as he deserves[.]' " *La Mantia v. Durst,* 234 *N.J.Super.* 534, 537, 561 *A.*2d 275 (App.Div.), *certif. denied,* 118 *N.J.* 181, 570 *A.*2d 950 (1989). *Quantum meruit* enables the performing party to recover the reasonable value of services he/she rendered. *Weichert Co. Realtors v. Ryan, supra,* 128 *N.J.* at 437–38, 608 *A.*2d 280. In *quantum meruit* "[i]t is well settled that where one performs services for another at his request, but without any agreement or understanding as to wages or remuneration, the law implies a promise on the part of the party requesting the services to pay a just and reasonable compensation…." *Conklin v. Kruger,* 79 *N.J.L.* 326, 328, 75 *A.* 436 (Sup.Ct.1910). *See also Lehrer McGovern Bovis, Inc. v. New York Yankees,* 207 *A.D.*2d 256, 615 *N.Y.S.2d* 31, 34 (1994) ("In order to state a claim

in *quantum meruit*, the plaintiff must assert: the performance of services in good faith; the acceptance for those services by the entity to which they were rendered; an expectation of compensation therefor; and the reasonable value of the services.").

Applying these principles, the New Jersey Supreme Court in *Weichert Co. Realtors v. Ryan, supra,* 128 *N.J.* at 441, 608 *A.*2d 280, held that a real estate agent was entitled, based on a theory of *quantum meruit,* to the reasonable value of his services rendered in connection with the purchase of property. Although the real estate agent and the buyer never agreed upon the amount of any commission to be paid, thereby precluding a binding contract, the Court reasoned that the agent was the "procuring cause" of the sale and that both the agent and the buyer intended that the agent be compensated for his services. *Ibid.* The Court stated:

> The record clearly establishes, however, that Tackaberry[, the real estate agent,] is entitled to recover in *quantum meruit* for the reasonable value of his services. The trial court's factual finding that Tackaberry was the procuring cause of the sale is supported by substantial evidence. Further, the proofs adduced at trial firmly establish that Tackaberry furnished Ryan[, the buyer] with information about the Pitt property with an expectation that Ryan would pay a brokerage fee, and Ryan himself admitted throughout the trial that he had always intended to compensate Tackaberry for his services. Given those circumstances, to deny Tackaberry compensation for services rendered would unjustly enrich Ryan and Saunders. *See Shapiro [v. Solomon], supra,* 42 *N.J.Super.* [377] at 383–84, 126 *A.*2d 654 [(1956)].
>
> [<em>Ibid.</em>]

The Eighth Circuit Court of Appeals in *Cool v. International Shoe Co.,* 142 *F.*2d 318, 319–20 (8th Cir.1944), upheld an employee's claim for "just compensation," or *quasi*-contract, against his employer. There, the defendant employer posted a placard which notified employees that the employer "would compensate any of them for valuable suggestions for improvements in methods of manufacture." *Id.* at 319. After reading the placard, the plaintiff, an employee, approached management about a machine attachment he developed which would greatly reduce expense. *Ibid.* The defendant responded that if successful, the plaintiff would be compensated, but the defendant never stated a specific amount. *Ibid.* The plaintiff's suggestion was successful. *Id.* at 319–20.

While noting that the agreement was too indefinite to constitute an enforceable contract, the *Cool* court determined that the employee was entitled to reasonable compensation for his efforts, stating:

> It is true that no contract between the parties resulted from plaintiff's offer to devise the appliances and attachments for defendant's machines and defendant's agreement that, if the appliances were made and were found valuable by defendant and used by it, the plaintiff would receive just compensation for their use. At this stage, the promises of the parties were too uncertain and indefinite for either to enforce them against the other. But when the appliances were made by the plaintiff, tried by the defendant, found successful, and accepted and thereafter used from day to day and year to year, the offer of the plaintiff was made certain by performance, and the liability of the defendant to pay, definite and certain by reason of its acceptance of the performance. So much is alleged in the complaint and admitted by the motion to dismiss. Only the amount of plaintiff's compensation and the time or times of its payment remain to be ascertained, and, therefore, are uncertain, but the law supplies the standard of reasonableness by which all of these uncertain matters can be made certain. The amount of payment and the time of payment under the allegations of the complaint became questions of fact to be determined on the evidence.

> [*Id.* at 320.]

Similarly, in *Matarese v. Moore–McCormack Lines, Inc.*, 158 F.2d 631, 633–35 (2d Cir.1946), the Second Circuit Court of Appeals found that the plaintiff stevedore, who developed a cargo loading device at his home which the defendant shipping company adopted, established a *quantum meruit* claim. The *Matarese* court found that the defendant was unjustly enriched by plaintiff's invention since it used the plaintiff's idea, after promising to pay plaintiff for its use, without compensating him for it. *Id.* at 634–35.

Here, the proofs on the summary judgment motion show that Verdi stated at a company meeting attended by defendant's employees, including plaintiff, that anyone who made any suggestion to improve the operation of the company would be financially rewarded. Plaintiff made suggestions which were adopted by defendant, and, as a direct result of these suggestions, defendant's production and profits increased. Plaintiff claimed that he reasonably expected compensation from defendant for making these suggestions.

Although defendant denied plaintiff's claims, the proofs presented on the critical issues involved are in dispute. For example, there are genuine issues of material fact as to whether plaintiff's suggestions for improving the equipment were part of his normal work requirements; whether plaintiff reasonably expected remuneration for the suggestions; whether the bonuses plaintiff received for his work satisfied defendant's promise of financial remuneration for the suggestions; and whether defendant was unjustly enriched by the suggestions. In sum, the critical factual issues raised precluded the granting of summary judgment.

## II.

We are also satisfied that the trial court erred in ruling as a matter of law that the shop right rule barred plaintiff's *quantum meruit* claim. In *United States v. Dubilier Condenser Corp.*, 289 *U.S.* 178, 188–89, 53 *S.Ct.* 554, 557, 77 *L.Ed.* 1114, 1119 (1933), the United States Supreme Court stated the following in discussing the shop right rule:

> Recognition of the nature of the act of invention also defines the limits of the so-called shop right, which shortly stated, is that where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention ..., he must accord his master a non-exclusive right to practice the invention. This is an application of equitable principles. Since the servant uses his master's time, facilities and materials to attain a concrete result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business. But the employer in such a case has no equity to demand a conveyance of the invention, which is the original conception of the employee alone, in which the employer had no part. This remains the property of him who conceived it ... to exclude all others than the employer from the accruing benefits.
>
> [Citations omitted.]

*See also* Annotation, *Application and Effect of "Shop Right Rule" or License Giving Employer Limited Rights in Employees' Inventions and Discoveries,* 61 *A.L.R.*2d 356, 360–63 (1958).

The shop right rule gives an employer only a non-exclusive right to the employee's invention. The employee retains the right to market his/her invention to others. *See Kinkade v. New York Shipbuilding Corp.*, 21 *N.J.* 362, 369, 122 *A.2d* 360 (1956);

*Crowe v. M & M/Mars,* 242 *N.J.Super.* 592, 594–95, 577 *A.2d* 1278 (App.Div.), *certif. denied,* 122 *N.J.* 387, 585 *A.2d* 389 (1990). The shop right rule was developed to prevent spurious claims by employees against employers, alleging that they developed inventions or novel ideas while working. *Kinkade v. New York Shipbuilding Corp., supra,* 21 *N.J.* at 370, 122 *A.2d* 360.

■■■■■■ A shop right does not arise simply because of the employer-employee relationship. Instead, an express agreement between the employer and employee can create a shop right or it can arise by implication from circumstances surrounding employment. A shop right can arise by implication if the employee uses the employer's resources—such as the employer's machinery or materials, aid from fellow employees, or the employer's time—to develop his/her invention. *Id.* at 369, 122 *A.2d* 360; *Crowe v. M & M/Mars, supra,* 242 *N.J.Super.* at 599, 577 *A.2d* 1278; *Clerke v. Beck,* 13 *N.J.Super.* 73, 76, 80 *A.2d* 252 (Ch.Div.1951).

At least one New Jersey court has noted that an employee's acquiescence to the employer using the employee's invention is a factor giving rise to a shop right. *See Eustis Mfg. Co. v. Eustis,* 51 *N.J.Eq.* 565, 571, 27 *A.* 439 (Ch. 1893) ("If one employed by another, whilst receiving wages, experiments at the expense of his employer, and constructs an invention, *which he permits his employer to use without compensation paid or demanded* ... a license to the employer to use the patent will be presumed." (emphasis added)). Nevertheless, in determining whether a shop right exists by implication, New Jersey courts have seemingly focused on whether the employee used the employer's resources, not on whether the employee acquiesced in the employer's use of the invention. *See, e.g., Crowe v. M & M/Mars, supra,* 242 *N.J.Super.* at 599, 577 *A.2d* 1278 ("The most significant factor triggering application of the shop right rule is the inventor's permitted use of paid time and plant personnel, [and] materials and machinery ...").

■■■■ The shop right rule, however, does not apply where the parties have excluded the creation of such a right by (1) express

contract to that effect or (2) by an express or implied agreement between the employer and employee that the employer will pay compensation for the use of the employee's suggestion or invention. *See* Annotation, *Application and Effect of "Shop Right Rule" or License Giving Employer Limited Rights for Employees' Inventions and Discoveries, supra,* 61 *A.L.R.2d* at 384–85. Where a *quantum meruit* claim has been established, the latter exclusion applies to preclude the shop right rule. For example, in *Deye v. Quality Engraving & Electrotype Co.,* 100 *N.E.2d* 310, 317 (Ohio Ct.C.P.1950), *rev'd on other grounds,* 90 *Ohio App.* 324, 106 *N.E.2d* 584 (1951), *appeal dismissed,* 157 *Ohio St.* 514, 105 *N.E.2d* 873 (1952), the court announced that the shop right can be precluded where the "employer and the employee by contract *or by other clear cut expression of intention enter into arrangements whereby the employer agrees to compensate the employee* for any invention which he may develop ... then *such agreement is effective and determines the relationship of the parties with regard to the invention."* (Emphases added.) Similarly, in *Toner v. Sobelman,* 86 *F.Supp.* 369, 373–75 (E.D.Pa.1949), an employee went to his employer with an invention, a mechanical grain cutter, which the employer agreed to market and pay the employee a proportionate share of any profits. The *Toner* court found that a shop right would not arise "in the face of an understanding to the contrary" between the employer and employee. *Id.* at 378. The court then noted that there was "an express promise on the part of [the employer] to pay the [employee] a proportionate share of the profits to be derived from the use of the grain trimmer...." *Ibid.* The court concluded that it would "enforce a promise to pay for the use of the invention despite the fact that such promise [was] indefinite to amount." *Ibid.*

■ In sum, a *quantum meruit* claim based on an express promise by an employer to his or her employee to provide compensation for business suggestions bars the application of the shop right rule. Plaintiff's proofs on the summary judgment motion showed that defendant promised financial remuneration to

any employee who made a profitable recommendation or improved defendant's equipment. That promise to pay, and plaintiff's subsequent reliance thereon, were sufficient to establish a *prima facie quantum meruit* claim, thereby precluding the application of the shop right rule. The trial court, therefore, erred in holding as a matter of law that the shop right rule barred plaintiff's claim.

### III.

We are also satisfied that the trial court erred in applying the doctrine of laches to bar plaintiff's claim. The present matter is controlled by the statute of limitations rather than by the doctrine of laches. The statute of limitations applies to legal actions while laches applies to equitable actions. *Quasi*-contract or *quantum meruit*, the theory the present matter is based on, is actually a legal remedy, albeit one based on equitable principles. *See Callano v. Oakwood Park Homes Corp., supra*, 91 *N.J.Super.* at 108, 219 *A.*2d 332 ("Contracts implied by law, more properly described as *quasi* or constructive contracts, are a class of obligations which are imposed or created by law...."). *See also St. Paul Fire and Marine Ins. Co. v. Indemnity Ins. Co. of N. Am., supra*, 32 *N.J.* at 22, 158 *A.*2d 825; *Cohen v. Home Ins. Co., supra*, 230 *N.J.Super.* at 82, 552 *A.*2d 654.

Thus, whether or not this action is time-barred should have been determined on the basis of the applicable statute of limitations. While there does not appear to be any New Jersey case directly on point, there are several New York decisions which apply the statute of limitations to *quasi*-contract and *quantum meruit* causes of action. *See, e.g., German v. Pope John Paul, II*, 211 *A.D.*2d 456, 621 *N.Y.S.2d* 311, 312 (1995) (finding that statute of limitations barred action based on breach of contract, unjust enrichment, and *quantum meruit* theories); *Wint v. Fields*, 177 *A.D.*2d 425, 576 *N.Y.S.2d* 266, 267 (1991) (holding that the evidence was insufficient for the statute of limitations to bar recovery of a *quantum meruit* cause of action); *Moors v. Hall*, 143 *A.D.*2d 336, 532 *N.Y.S.2d* 412, 415–16 (1988) (affirming trial court's ruling

that *quantum meruit* claim for certain period was barred by six-year statute of limitations); *Bank Leumi Trust Co. of N.Y. v. John Malasky, Inc.,* 108 *A.D.*2d 1089, 485 *N.Y.S.2d* 868, 870 (1985) ("We ... find no merit to plaintiff's contention that [the lower court] erred in dismissing the complaint as time barred because, if read liberally, the complaint makes out a cause of action in implied or quasi[-]contract and, thus, a six-year [s]tatute of [l]imitations was applicable....").

 The applicable statute of limitations in New Jersey is *N.J.S.A.* 2A:14–1 which, in part, provides:

> Every action at law for ... recovery upon a contractual claim or liability, express or implied, not under seal, or upon account other than one which concerns the trade or merchandise between merchant and merchant, their factors, agents and servants, shall be commenced within 6 years next after the cause of any such action shall have accrued.
>
> This section shall not apply to any action for breach of any contract for sale governed by section 12A:2–725 of the New Jersey Statutes.

Since plaintiff's *quantum meruit* action was instituted against defendant within six years after the cause of action accrued, it was not time-barred.

## IV.

 Finally, we hold that plaintiff's *quantum meruit* claim was not barred by the entire controversy doctrine. The entire controversy doctrine requires "a party to join all its claims against its adversary when those claims [are] related to and part of the same [underlying] controversy." *Aetna Ins. Co. v. Gilchrist Bros., Inc.,* 85 *N.J.* 550, 557, 428 *A.*2d 1254 (1981). The doctrine's essential principle is that "the adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy." *Cogdell v. Hospital Ctr. at Orange,* 116 *N.J.* 7, 15, 560 *A.*2d 1169 (1989). *See also DiTrolio v. Antiles,* 142 *N.J.* 253, 267, 662 *A.*2d 494 (1995).

■ The purpose underlying the doctrine is the avoidance of waste, delay, and fragmented litigation while providing fairness to the parties to the action and those with a material interest in the action. *Cogdell v. Hospital Ctr. at Orange, supra,* 116 *N.J.* at 23, 560 *A.*2d 1169. Yet, it is also an equitable doctrine predicated upon "judicial fairness and will be invoked in that spirit." *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 343, 476 *A.*2d 250 (1984), *appeal after remand,* 248 *N.J.Super.* 540, 591 *A.*2d 966 (App.Div. 1991), *certif. denied,* 126 *N.J.* 385, 599 *A.*2d 162 (1991).

Here, we hold that the entire controversy doctrine should not apply to bar plaintiff's *quantum meruit* claim simply because plaintiff had previously filed a wage claim with the Wage Collection Division of the Department of Labor pursuant to *N.J.S.A.* 34:11–57 *et seq.* While the *quantum meruit* claim may fall within the broad definition of wages set forth in *N.J.S.A.* 34:11–57, plaintiff would not have had a fair and reasonable opportunity to fully litigate such a claim against defendant in the Department of Labor. The jurisdictional limit of wage claims in such proceedings is $10,000. *See N.J.S.A.* 34:11–58. In the present matter, plaintiff is seeking damages in excess of the $10,000 limit. Consequently, the doctrine should not have been applied to bar plaintiff's *quantum meruit* claim in the circumstances of this case.

■ Beyond this, even if the entire controversy doctrine were applicable, defendant waived that defense. The entire controversy doctrine is an affirmative defense. *See Brown v. Brown,* 208 *N.J.Super.* 372, 384, 506 *A.*2d 29 (App.Div.1986). *R.* 4:5–4 provides in part that "[a] responsive pleading shall set forth specifically and separately a statement of facts constituting an avoidance or affirmative defense...." "[A]n affirmative defense is waived if not pleaded or otherwise timely raised." *Brown v. Brown, supra,* 208 *N.J.Super.* at 384, 506 *A.*2d 29 (citing *R.* 4:6–7). In addition, a party's conduct can estop him/her from relying on an affirmative defense. *Ibid.*

Defendant did not raise the entire controversy doctrine defense in its answer to plaintiff's amended complaint. Nor did defendant

raise or argue the doctrine in its primary and reply briefs filed in support of the summary judgment motion. In fact, in its opinion granting summary judgment, the trial court noted that the entire controversy doctrine was only "briefly alluded to[.]" Defendant defended this case for over three years without raising or even mentioning the doctrine. *Cf. Brown v. Brown, supra,* 208 *N.J.Super.* at 383, 506 *A.*2d 29 (noting that the defendant, who was barred from invoking the entire controversy doctrine, vigorously defended case for two-and-a-half years before raising the defense). Consequently, defendant waived the entire controversy defense.

### V.

Accordingly, the summary judgment under review is reversed and the matter is remanded to the trial court for further proceedings.