**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2909-17T2

THE TOSCANO LAW
FIRM, LLC,

      Plaintiff-Respondent,

v.

ELLIS HAROLDSON,

      Defendant/Third-Party
      Plaintiff-Appellant,

and

ARTHUR G. MARGEOTES (in
both his personal and professional
capacities),

      Defendant,

v.

PATRICK P. TOSCANO, JR., ESQ.,

      Third-Party Defendant/Fourth-
      Party Plaintiff-Respondent,

v.

ROPER & TWARDOWSKY, LLC,
ANGELA ROPER, ESQ. (in both her
professional and personal capacities),
KENNETH THYNE, ESQ. (in both his
professional and personal capacities),
ELLIS HAROLDSON, and ARTHUR
G. MARGEOTES (in both his
professional and personal capacities),

Fourth-Party Defendants.

_____

Argued December 10, 2019 – Decided May 12, 2020

Before Judges Yannotti, Hoffman and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-2764-14.

Kenneth S. Thyne argued the cause for appellant (Roper & Thyne, LLC, attorneys; Kenneth S. Thyne, on the briefs).

Patrick P. Toscano, Jr. argued the cause for pro se respondent The Toscano Law Firm, LLC (Patrick P. Toscano, Jr., and AnnMarie Harrison, on the brief).

Joseph De Donato argued the cause for respondents The Toscano Law Firm, LLC, as to the counterclaim only, and respondent Patrick J. Toscano, Jr., Esq. (Bennett Bricklin & Saltzburg, LLC, and Braff, Harris, Sukoneck & Maloof, attorneys; Joseph De Donato, of counsel and on the brief; Mark Thomas Hall, on the brief).

PER CURIAM

A-2909-17T2

This case involves a dispute between a client and the law firm and attorney who represented him for two years in a whistle-blower case that settled in September 2013, less than three weeks after the client discharged the firm. Approximately six months later, The Toscano Law Firm, LLC (the Toscano Firm) sued the client, defendant Ellis Haroldson, seeking payment of attorney's fees. Along with his answer, Haroldson filed a counterclaim and third-party complaint,[1] asserting various claims, including legal malpractice and breach of contract. Haroldson's claims were unsuccessful and, after a bench trial, the trial court awarded the Toscano Firm over $31,000 in attorney's fees; in addition, the court rejected Haroldson's demand for the return of a $15,000 retainer he paid when he initially engaged the Toscano Firm.

On appeal, Haroldson argues that the trial judge erred by 1) denying a jury trial on the quantum meruit claim, 2) excluding his expert's opinions, 3) denying frivolous litigation sanctions, and 4) denying access to off-record statements and emails. We find no errors in the trial court's dismissal of Haroldson's affirmative claims, sanctions determination, or evidence rulings. However, we conclude the trial court erred when it denied Haroldson's request for a jury trial regarding the

---

[1] Haroldson's third-party complaint asserted claims against Patrick P. Toscano, Jr., (Toscano) individually.

disputes over attorney's fees and the retainer Haroldson paid.  We therefore affirm, in part, and reverse and remand, in part.

I

The Borough of Cliffside Park (the Borough) employed Haroldson as a police officer from January 1994 to June 2010.  According to Haroldson's CEPA[2] complaint, his duties in 2008 and 2009 included filing complaints against bars for violations of Borough ordinances and regulations of the New Jersey Alcoholic Beverage Control Commission (ABC).  He alleged that the son of the Borough's mayor "worked for a liquor house" that "supplied all of the local bars with liquor," and these bars lost income if a bar was suspended from selling liquor as a result of a complaint Haroldson filed.  He alleged that he "complained to the ABC about the actions of the Mayor and Council in refusing to process the complaints in a lawful manner" and that Mayor Gerald Calabrese and Chief of Police Donald V. Keane learned of his complaints.

The record indicates Haroldson went out on disability leave for cardiac surgery from September 2008 to July 2009.  On November 13, 2009, Chief Keane served Haroldson with a preliminary notice of major disciplinary action (PNMDA).  The notice concerned Haroldson's alleged conduct in collecting a

---

[2] Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -14.

personal debt from a man named Vincent O'Hara and his company. In communications with O'Hara and his wife, Haroldson purportedly stated that he was "a cop who carries a gun," and said that O'Hara would be "stopped all over the county" by Haroldson's police friends. Chief Keane charged Haroldson with abuse of public office, official misconduct, conduct unbecoming a police officer, and a violation of the implicit standard of good behavior. Two months later, Chief Keane served Haroldson with notice of an additional charge, "manipulating and wrongfully using the judicial system by misleading the court" (the supplemental charge).

The disciplinary charges all resulted from a complaint filed by O'Hara's wife in July 2009, alleging harassment by Haroldson over a two-year period. In July and August 2009, the officer heading the Internal Affairs Division of the Police Department took statements from O'Hara, his wife, and one other witness. At the direction of Chief Keane, the investigating officer did not speak with Haroldson about the complaint and interviews, despite an internal policy providing that "Internal Affairs shall notify the suspect officer in writing that an internal investigation has been started, unless the nature of the investigation requires secrecy."

5

During two days in February and March 2010, retired Judge Anthony J. Sciuto, appointed as a hearing officer in the disciplinary action, heard testimony and received evidence on the disciplinary charges. In his report and recommendation dated April 21, 2010, Judge Sciuto stated that "[i]t is important to note at the outset that the charges against Sergeant Haroldson do not emanate from his official duties and responsibilities as a police officer," but from his efforts to collect a personal debt. Judge Sciuto found "no believable testimony that Sergeant Haroldson threatened Mr. O'Hara by saying 'I'm a cop who carries a gun and I will have you stopped all over the county."' Regarding the supplemental charge, the judge found that the Borough failed to prove that Haroldson misled the court or misused the judicial system.

As to the harassment allegations, however, Judge Sciuto found:

> What is supported are the voluminous and numerous phone calls that were made to either Mr. O'Hara at his business or to Mr. and Mrs. O'Hara at their residence. These phone calls were perceived by Vincent O'Hara and Mrs. O'Hara, his wife, as harassing, threatening, and fearful. Although I cannot describe the phone calls as threatening by Sergeant Haroldson[,] they were perceived as being threatening by the recipients of the calls and there is no question that the sheer number of calls were harassing to Mr. and Mrs. O'Hara.

Judge Sciuto recommended that Haroldson "be found responsible for making harassing phone calls" that were "perceived by [the O'Haras] to be

6

threatening," thus proving the four original disciplinary charges. While the judge acknowledged that Haroldson made the harassing phone calls in a personal capacity, he noted that "the fact is, he is a police sergeant" and "[t]he standard of professionalism and good behavior must be upheld in his daily life." The judge recommended that Haroldson "receive a penalty of time served, plus [ninety] days suspension from the date of this recommendation."

On June 15, 2010, by resolution, the Borough "accepted and adopted" Judge Sciuto's "factual findings and conclusions," and "found and adjudged" that Haroldson "committed each and every one of the disciplinary infractions with which he has been charged," including the supplemental charge that Judge Sciuto had expressly determined was "not supported by any credible testimony." Rather than suspend Haroldson as Judge Sciuto recommended, the Borough determined that "the appropriate penalty for such disciplinary infractions is termination." Eight days later, Haroldson filed a complaint in lieu of prerogative writs (prerogative writ action), seeking, among other relief, a de novo hearing on the disciplinary charges and the restoration of his employment.

On February 9, 2011, Judge Joseph S. Conte held a bench trial in the prerogative writ action. In a March 2, 2011 decision, the judge ruled there was

7

"insufficient evidence in the record to reverse Judge Sciuto's finding that the sheer number of calls constituted harassment."

On the issue of the appropriate penalty, Judge Conte noted that New Jersey case law "support[s] the standard that a public employee whose conduct is not egregious enough to warrant termination should not be punished with more than a six-month suspension." The court was "uncertain" as to whether Judge Sciuto had been aware of this standard and had known that his recommendation – time served plus a ninety-day suspension – would extend Haroldson's suspension beyond six months, effectively resulting in his termination. The court observed that "[o]ne may infer that if Judge Sciuto was definitely aware of this rule, he would have simply recommended the termination of Haroldson's employment if he truly intended that to be the result." Accordingly, the court remanded the matter to Judge Sciuto for further consideration, "in light of the seriousness of the allegations of harassment and the appropriateness of sentencing in light of the six-month rule" set out in case law.

On April 11, 2011, Judge Sciuto issued a supplemental letter opinion, clarifying that he "only intended to suspend" Haroldson. He explained:

> Had I been aware of the cases which require termination for a period of suspension imposed for over six months[,] I would have reduced my recommendation to bring the penalty within a six month period. . . . So the

A-2909-17T2

> record is clear . . .  I was recommending only a period of suspension not a termination.

## A.  Haroldson's CEPA Claim

On June 15, 2011, Haroldson filed his CEPA lawsuit,[3] naming as defendants the Borough, the Cliffside Park Police Department, Mayor Calabrese, and Chief Keane.  Among other things, Haroldson claimed that Chief Keane pursued the disciplinary charges against him in retaliation for his "whistle-blowing activities."  He also alleged that he was "relieved of his duties in filing any complaints against any bars or liquor stores and this duty was transferred to another officer" in retaliation for his complaints to the ABC.  Thirteen days after Haroldson filed his CEPA complaint, the Borough adopted a resolution acknowledging that Judge Sciuto recommended only a suspension, but nevertheless reaffirmed its prior decision to terminate Haroldson's employment.

The termination issue then returned to Judge Conte for consideration in the prerogative writ action.  On July 26, 2011, Judge Conte found that the Borough proved the original disciplinary charges by a preponderance of credible

---

[3]  According to Haroldson, another attorney filed the complaint for him as "a favor."

evidence, but held that it should have taken Judge Sciuto's clarification of the recommended penalty into consideration. He concluded:

> In reviewing the record below, this [c]ourt finds that the sanctions imposed upon Haroldson were so disproportionate to his offense, that it shocks the [c]ourt's sense of fairness. Though Haroldson's behavior amounted to harassment due to the sheer number of calls he placed to the O'Haras and his position in the community as a police officer, the sanction of termination is not appropriate for a [seventeen]-year police veteran at the rank of Sergeant with no prior disciplinary infractions on his record. In keeping with the principle of progressive discipline, this [c]ourt finds it exceedingly unfair to impose such a punishment on Haroldson who was simply trying to collect a considerable debt, which he felt he was owed.

Concluding that the Borough's resolution to terminate Haroldson was "arbitrary and capricious," Judge Conte held that his punishment "should be limited to a suspension of exactly six months" from November 13, 2009. Haroldson apparently returned to work after the conclusion of the prerogative writ action, but the record does not indicate for how long. At some point after his return, Haroldson "had gotten hurt" and "was seeking accidental disability" benefits from the New Jersey State Division of Pensions and Benefits. Eventually, Haroldson received an accidental disability pension.

B.  The retention and termination of the Toscano Firm

On October 19, 2011, Haroldson executed a retainer agreement with the Toscano Firm for the CEPA case, and the Toscano Firm filed a substitution of attorney with the court.  The retainer agreement provided that the Toscano Firm "shall represent the CLIENT'S interest and protect your legal rights and do all necessary legal work to properly represent you in this matter."  The agreement stated that there would be "certain inevitable costs to be incurred" in the litigation and that "[r]esponsibility for these costs" would be "distributed as follows:  RETAINER of:  $15,000 (nonrefundable) plus 25% of any eventual net recovery."

Haroldson testified he paid the Toscano Firm a $15,000 retainer, and Toscano told him that he would get it back at the end of the case.  He recounted:

> I told [Toscano] that I needed somebody to protect me because I had a target on my back.  He agreed to take a retainer of $15,000.  He explained to me it was a . . . fee-shifting case, and he was going to charge [twenty-five] percent of any settlement because he does that for all law enforcement officers, instead of one-third, and that the $15,000 would be returned to me upon settlement of the case.

The Toscano Firm represented Haroldson in the CEPA case for nearly two years, and while the parties do not dispute what actions the Toscano Firm took to protect and advance Haroldson's interests during that time, their views as to

11

the adequacy of those actions differ significantly. Between October 2011 and the first discovery end date, December 15, 2012, the Toscano Firm propounded and responded to discovery requests, reviewed documents and interrogatory responses received from the defendants, served deposition notices for Mayor Calabrese and Chief Keane, prepared Haroldson for his deposition, and represented him at two days of deposition questioning, although his deposition was not completed. During this time, the Toscano Firm scheduled the depositions of Mayor Calabrese and Chief Keane several times, but each time they were adjourned at the request of defense counsel, not the Toscano Firm.

Fourth-party defendant Arthur G. Margeotes joined the Toscano Firm in the fall of 2012. He began working on Haroldson's CEPA case in January 2013, after the discovery end date and after the court scheduled the initial trial date of March 4, 2013. On January 16, 2013, the Toscano Firm filed a motion to reopen discovery, which the defendants in the CEPA case opposed.

On January 31, 2013, the parties appeared for a settlement conference before Judge Robert L. Polifroni. The Toscano Firm withdrew its motion to reopen discovery, without prejudice, and the judge entered an order 1) adjourning the trial date from March 4 to June 10, 2013, and 2) scheduling another settlement conference for March 5, 2013. The order further provided

12

that, if the case did not settle by the March 5 settlement conference, Haroldson could "re-file his motion to compel the deposition of party defendants."

When the case did not settle, the Toscano Firm re-filed its motion to reopen discovery, which the court granted. After the Toscano Firm continued to encounter problems in scheduling the depositions in the CEPA case, on May 15, 2013, the court granted its motion to compel, scheduling Chief Keane's deposition for May 22, 2013, and Mayor Calabrese's deposition for May 23, 2013; however, these court-ordered depositions did not occur. Mayor Calabrese's deposition did not take place because he became "very seriously ill" during the CEPA litigation. According to Haroldson's brief, Chief Keane's deposition did not go forward on the court-ordered date because Toscano "insisted" on deposing Mayor Calabrese first. Mayor Calabrese's counsel requested an adjournment of the June 10, 2013 trial date, which the court granted. In June or July 2013, Margeotes left the Toscano Firm.

Judge Polifroni held a status conference on September 3, 2013. The parties sharply dispute what transpired that day. Toscano testified that the CEPA defendants, through Judge Polifroni, made a settlement offer of $125,000. Toscano said "the numbers talked about" by the parties were a demand for $275,000 and an offer of $125,000, and Judge Polifroni told him during their

discussions that he believed the case could settle for $200,000. According to Toscano, it was "very obvious" that "if the demand came down to [$200,000] right in the middle of the [$125,000] and the [$275,000] the case would have settled that day, literally that day, then and there." Toscano said that he unsuccessfully tried to get authority from Haroldson to settle for $200,000:

> I told Mr. Haroldson straight out that if he settled it for [$200,000], my attorney[']s fee would be reduced to $10,000. I remember that like it happened a minute ago. He said, no. He then went on a tirade, one of his tirades, cursing.
>
> . . . .
>
> We didn't settle because of his tirade and what he said to me.

Contrary to Toscano's recollection, Haroldson testified, during the bench trial on the fee dispute, that no settlement offer for any amount was conveyed to him at the conference, and Toscano did not offer to take a reduced fee if the case settled for $200,000. Later, before the jury, Haroldson acknowledged that Toscano had told him at the September 2013 conference that there was a settlement offer of $125,000.

Dennis Calo, lead defense counsel in the CEPA case, testified that he was never authorized to make and did not make any settlement offer while the Toscano Firm represented Haroldson, either at the September 2013 conference

A-2909-17T2

or any other time. He disputed Toscano's contentions that, at the conference, the demand was $275,000, the municipality unofficially countered at $125,000, and the matter could have settled that day for $200,000.

Calo said that he had "very limited" settlement discussions with Toscano. He recounted that Toscano made several demands, but he did not believe they were made in a good faith effort to settle the case because the demands were "a moving target" that were "all over the lot."

According to Calo, at Haroldson's deposition, Toscano said he believed the case could resolve for $125,000. Calo said the $125,000 figure came from Toscano, not himself, and he "didn't think it was a reasonable demand or a settlement figure at the time," but he "thought it wasn't crazy"; however, just a few days later, he received a letter or an email from Toscano demanding "close to $400,000."

Calo noted that there were prior settlement conferences with Judge Polifroni on January 31, 2013, and March 5, 2013. At the first conference, Toscano said that Haroldson "would probably take" $300,000 to settle the case. At the second conference, Toscano made a demand for $275,000, and Calo responded that this "was not reasonable." On May 15, 2013, Toscano made a

A-2909-17T2

demand for $425,000 and Calo did not respond. On July 1, 2013, Toscano made a demand for $399,707.85.

Calo did not recall specific details of the September 2013 conference with Judge Polifroni, but insisted he never tendered a settlement offer of any amount to Toscano. Calo explained he would have needed authority from both the Borough and the insurance carrier to make an offer, and he did not have it.

Also, Calo testified that a significant hurdle to settlement was a non-monetary issue. The position of the CEPA case was that Haroldson would have to agree to leave the police department and not reapply for another position with the Borough, and this was an essential part of any resolution. Toscano, however, never committed to that requirement. Calo explained:

> With respect to the retirement [Toscano] was never clear on what [Haroldson] would do, and that was the first requirement, you had to be clear that he would leave the job. If he said – if he said he would leave the job there's a basis to negotiate, so that's why there was no negotiation, because he never said he would leave the job. If he, on the other hand he said, no, he will not leave the job, then we would know we're not going to negotiate, we're going to try the case. So that's – that [was] the posture of the case.

Following the September 2013 conference, Judge Polifroni entered an order setting a deadline of September 30, 2013, for completing the depositions

A-2909-17T2

of Haroldson, Mayor Calabrese, and Chief Keane.  The order further provided that if Calabrese was "not cleared medically" so that he could be deposed by the deadline, he would not be permitted to testify at trial.  Finally, the order set January 2, 2014 as "a firm trial date . . . not subject to further adjournments due to lawyer or client unavailability."

C.  CEPA case settlement and fee dispute

Because Margeotes had worked on his CEPA case while an associate at the Toscano Firm, Haroldson testified that he decided the day of the September 2013 conference to retain Margeotes to replace the Toscano Firm.  Haroldson said that he trusted Toscano when he first retained the Toscano Firm, but the relationship "went totally south" as the CEPA case proceeded.  He said that, in the four or five months leading up to the September 2013 conference, Toscano advised him that he thought their attorney-client relationship should end and sent him an email directing him to find another attorney.  Haroldson thought that would be very difficult to do so late in the case, so he asked Toscano to stay, "hoping things would improve."

By the time the parties appeared before Judge Polifroni on September 3, 2013, Haroldson stated, "There was considerable tension between myself and Mr. Toscano. . . ."  According to Haroldson, Toscano had promised but failed to

1) try to move the CEPA case to federal court, and 2) depose each member of the Borough council. Toscano had also failed to obtain more specific answers to interrogatories, which Haroldson said he repeatedly asked him to do. From Haroldson's perspective, Toscano "was not prepared to try my case or to even negotiate a reasonable settlement."

On September 6, 2013, Haroldson retained Margeotes to represent him in the CEPA case, and Margeotes sent Toscano a letter advising him of this development. Margeotes later certified that he believed "discovery was far from complete and the case was not trial ready" when he took it over, despite the trial court's "definitive" September 30 deadline for completion of all outstanding depositions.

Margeotes testified that he had a good working relationship with Calo and believed that he did not engage in "game playing" during the settlement negotiations that took place after he took over representation from the Toscano Firm. Calo and Margeotes previously met when the latter was an assistant prosecutor in Passaic County; in addition, they "had brief interactions" during the CEPA case when the Toscano Firm handled it.

Calo said that Margeotes called him within a day or so of taking over, advising that he now represented Haroldson. Margeotes told him he was "in a

pickle on the case" because nothing had been done, so he wanted to settle the case or extend the discovery period again. According to Calo,

> [W]e discussed settlement of the case. He readily agreed that a condition of the settlement would be that Mr. Haroldson would have to leave the job and not reapply for any position with [the Borough], so that there was a basis to continue discussions. I told him to tender a demand to settle the case, and I think the demand was a little over $200,000, and very quickly we ended up settling the case for $200,000 on the condition that . . . Mr. Haroldson at that time was applying for a disability pension, and he was going to go out on a disability pension, and I think the whole settlement was contingent upon him retiring on a disability pension and – and leaving the job.

The CEPA case settled for $200,000 on or about September 25, 2013. Approximately $56,000 of that amount represented monies due to Haroldson for vacation time and other accrued back pay. A condition of the settlement was that Haroldson would leave the police force.

Margeotes wrote to Toscano on September 25, 2013, advising him that "a tentative settlement agreement" had been reached in the CEPA case and asking for a copy of the Toscano Firm's retainer agreement and a "complete accounting" of the Toscano Firm's time on the matter. Toscano responded that the Toscano Firm was "invok[ing] an attorney lien of [twenty-five percent] of the first $200,000 collected." Margeotes took a fee of $12,500 for his work on the CEPA

case and "segregated $50,000.00 in trust from the settlement" pending resolution of the Toscano Firm's claim for fees.

On November 15, 2013, the Toscano Firm filed a motion seeking an attorney's lien and disclosure of the amount of the settlement. On January 17, 2014, the court entered an order 1) establishing a lien, "the amount to be determined by further proceedings in this [c]ourt or by the District Fee Arbitration Committee,"[4] and 2) requiring the Toscano Firm to produce its time records relating to the CEPA case.

The Toscano Firm moved for an enhanced fee, and Haroldson moved for a reduction in the $50,000 that Margeotes held in escrow. On March 7, 2014, the court denied the motion for an enhanced fee, explaining:

> Here, the [c]ourt does not find that Mr. Toscano encountered work that was more difficult or time consuming beyond that which is normally encountered in similar cases. The fact that Mr. Haroldson may have been a "needy" client, or [the] fact that depositions had to be rescheduled due to a defendant's illness is not sufficient to show that Mr. Toscano's work was more difficult or time-consuming than normal.

---

[4] There is no dispute that Toscano filed the arbitration notice required by the Court Rules and Haroldson opted not to proceed with fee arbitration, although it is not clear from the record exactly when this occurred.

A-2909-17T2

The court granted Haroldson's motion for a reduction of the monies in escrow, holding that the amount "need not exceed" $31,250. It explained: "The [c]ourt will reduce the fee to [twenty-five percent] of $125,000 because $125,000 is the number that represents a settlement offer obtained by Mr. Toscano." The court directed Toscano to file a petition to set the amount of the attorney's lien within fourteen days.

Rather than file a petition in the CEPA case, the Toscano Firm filed a separate lawsuit – the matter under review – naming both Haroldson and Margeotes as defendants. The complaint filed by the Toscano Firm sought to enforce an attorneys' lien for services it performed in representing Haroldson in his whistle-blower lawsuit. In addition, the complaint asserted claims for intentional interference with prospective economic advantage and intentional interference with contractual relations against Margeotes.

On June 9, 2014, Haroldson filed an answer, together with a counterclaim against the Toscano Firm and a third-party complaint against Patrick P. Toscano, Jr., Esq., individually. Along with his claims for legal malpractice and breach of contract, Haroldson asserted eight additional claims. Haroldson demanded "a trial by jury . . . on all issues so triable" and timely filed an affidavit of merit in support of his legal malpractice claim.

In addition to an answer to the third-party complaint, Toscano filed a fourth-party complaint against Haroldson and Margeotes, and named as fourth-party defendants the law firm, and individual attorneys representing Haroldson in the case, specifically, Roper & Twardowsky, LLC (R&T), Angela Roper, and Kenneth Thyne (collectively, the R&T defendants). While the fourth-party complaint listed sixteen "specific causes of action," Toscano generally alleged that Margeotes and the R&T defendants improperly 1) lured Haroldson away from the Toscano Firm, and 2) induced Haroldson to refuse to pay attorneys' fees to the Toscano Firm for its work on the CEPA case and to assert unwarranted legal malpractice claims. In accordance with <u>Rule</u> 1:4-8(b)(1), Haroldson and the R&T defendants sent Toscano a notice asserting that the fourth-party complaint violated the frivolous litigation rule and demanded Toscano withdraw the pleading, action he did not take.

After several motions challenging the fourth-party complaint, on October 27, 2014, the court dismissed it without prejudice. Thereafter, Toscano filed a motion 1) to file an amended fourth-party complaint, and 2) to disqualify the R&T defendants from representing Haroldson. The R&T defendants and Haroldson sent Toscano a notice asserting his motion to file an amended fourth-party complaint violated the frivolous litigation rule and demanded its

22

withdrawal. Toscano did not withdraw the motion, which the trial court denied on February 6, 2015.

In February 2016, Toscano moved for summary judgment as to the third-party complaint and the Toscano Firm moved for summary judgment as to Haroldson's counterclaim. These motions were returnable on April 1, 2016, which was three days before the then-scheduled trial date, so the court declined to consider them on the merits.

Trial began on May 2, 2016 but ended in a mistrial on May 11, 2016. The record does not disclose the reason for the mistrial.

On July 21, 2016, Toscano and the Toscano Firm again moved for summary judgment as to Haroldson's claims against them. The trial court granted the motions in part, dismissing Haroldson's claims for 1) legal malpractice, 2) intentional infliction of emotional distress, 3) negligent infliction of emotional distress, and 4) negligent supervision. The court denied summary judgment as to Haroldson's claims for 1) negligent misrepresentation, 2) breach of contract, 3) breach of fiduciary duty, 4) intentional attorney misconduct, and 5) fraud.

On June 28, 2017, the trial court ruled, over Haroldson's objection, that the Toscano Firm's attorney's lien claim should be decided by the court without

A-2909-17T2

a jury.   Regarding Haroldson's remaining affirmative claims, the court acknowledged that the right to a jury trial would attach "[u]nder normal circumstances," but it expressed concern that trying the lien claim to the court and the other claims to a jury could produce "inconsistent results . . . inconsistent verdicts," and "factual discrepancies in findings."  The court did not resolve the issue at the time; however, it noted that it might "try the whole proceeding" without a jury to avoid any inconsistencies and to promote judicial economy. The court conducted a bench trial and heard testimony on the Toscano Firm's attorney's lien claim on June 28 and 29, 2017.[5]

The court then empaneled a jury to hear Haroldson's remaining claims, and trial took place on July 17, 18, and 19, 2017.  At the close of Haroldson's evidence, the Toscano Firm and Toscano moved to dismiss all claims against them.  The court held that Haroldson failed to establish a prima facie case as to all claims, except his claim that the Toscano Firm and Toscano had promised to return his $15,000 retainer fees but then reneged, which Haroldson contended

---

[5]  Rather than issuing a decision on the attorney's lien claim at that point, the court requested counsel to submit proposed findings of fact and conclusions of law.

was a breach of contract and fraud. The court ruled that the dispute as to the $15,000 retainer was "a fee issue." It explained:

> On the issue of the fraud, or the statement, that I will return your $15,000 retainer, I find that issue so inextricably tied to the issue of the fee under the fee lien, and any setoff, that the [c]ourt must determine that issue. I – I don't want to run the risk [of] the possibility of an inconsistent verdict, so I'm going to determine that issue.

The court granted the motion to dismiss all of Haroldson's claims "except with respect to the fee issue," on which it reserved.

In a written opinion issued on August 25, 2017, the court held that the Toscano Firm was "entitled to the entire lien of $31,250." On September 18, 2017, the court entered an order directing Margeotes to forward that sum, which had been held in escrow, to the Toscano Firm. In its opinion, the court also rejected Haroldson's "contention that Toscano unconditionally promised to refund the $15,000 retainer in the event of a settlement."

On September 27, 2017, Haroldson filed a motion before the Assignment Judge that sought access to CourtSmart[6] recordings of threatening statements

---

[6] CourtSmart is the digital audio recording system installed in New Jersey courtrooms statewide. With CourtSmart, the microphones in a courtroom remain active and recording whenever the courtroom is open, regardless of whether court is in session or in recess.

A-2909-17T2

allegedly made by Toscano in the courtroom during court recesses in May 2016 and June 2017. On October 13, 2017, the judge denied release of the requested recordings, but stated "the court shall conduct an in-camera review of the CourtSmart back-up tape." Following that review, the court indicated the tape "did not contain indicia of a threat." Nevertheless, the court released the back-up recording, which "contained a terse conversation that took place among individuals . . . once the trial judge left the bench." Regarding the May 2016 recordings, the judge noted they were reviewed by the Trial Court Administrator, who heard nothing relevant or material to Haroldson's allegations rendering the request for recordings moot.

On October 10, 2017, Haroldson moved for sanctions against the Toscano Firm and Toscano for having filed the fourth-party complaint in June 2014 and for having moved to file an amended fourth-party complaint in December 2014. The Toscano Firm filed a cross-motion for attorneys' fees, contending that Haroldson's sanctions motion was filed in bad faith.

Both motions were denied on December 15, 2017.[7] The motion court held that Haroldson's motion was untimely under Rule 1:4-8(b)(2), which required

---

[7] The cross-motions for sanctions were also decided by the Assignment Judge.

any motion for sanctions to be filed no later than twenty days following the entry of final judgment, stating that "[t]he final judgment on this case was rendered by the [c]ourt on August 25, 2017," and the motion was not filed until October 10, 2017. The court further found that Toscano did not lack "a good-faith belief in his motion for enhanced fees," and believed the allegations "in the proposed pleadings were . . . entirely accurate." As for the cross-motion, the court found that the Toscano Firm had failed to show bad faith and denied it.

On January 29, 2018, the court entered an order dismissing the remaining claims in Haroldson's counterclaim and third-party complaint. On April 17, 2019, counsel for the Toscano Firm filed with the trial court a voluntary dismissal of its claims against Margeotes.

D. Wasserman's opinions

Haroldson sought to use as an expert witness Bennett J. Wasserman, an attorney representing litigants and providing consulting services "in matters concerning the law governing lawyers." Wasserman served reports dated December 7, 2014, and January 2, and April 15, 2016.

Wasserman opined that Toscano acted improperly in numerous ways when Haroldson was a client of the Toscano Firm, most notably by conducting discovery in a manner that "unreasonably delayed resolution" of the CEPA case

and by handling the case in a way that violated his duty to represent his client diligently and promptly. Relying on testimony provided by Margeotes at his deposition, Wasserman stated that Toscano failed "to properly prosecute and preserve" the CEPA case, so that when Margeotes took over, he faced the significant problems of "missing depositions, un-supplemented interrogatory answers and no expert witness." Wasserman also criticized a number of actions that Toscano took after the Toscano Firm's representation was terminated, opining that Toscano engaged in "waging a relentless anti-client campaign against his client just to secure payment of his asserted fee."

Wasserman did not testify at trial. The court dismissed Haroldson's legal malpractice claims on summary judgment, holding that he failed to provide "expert testimony as to what the appropriate settlement figure would have been" had Toscano not deviated from the standard of care. Later, when Haroldson sought to have Wasserman testify before the jury on the claims related to Toscano's post-discharge actions, the court held that Wasserman's opinions were net opinions as to those claims because he failed to sufficiently articulate a standard of care for attorneys seeking payment after the termination of representation. It is not clear from the record whether Haroldson did not offer

or the court precluded Wasserman's testimony during the bench trial proceedings on the issue of the lien claim.

E. Lien claim decision

The trial court decided the lien claim and the $15,000 retainer dispute on August 25, 2017. The court found that Toscano "expended in excess of one hundred twenty (120) hours in the prosecution of the" CEPA case, and it accepted his time records as "generally accurate." The court found that "a significant amount of work was performed, including, paper discovery, conferences, calls, and the deposition of his client." The court contrasted the time spent by Toscano with the time spent by Margeotes, which was "limited to that required to negotiate the settlement over the phone, and to prepare and review settlement documents."

The court found that a settlement offer of $125,000 had been made at the September 2013 conference before Judge Polifroni, discounting Calo's testimony on that point. It further explained:

> With respect to the merits of Haroldson's claim, the [c]ourt will judicially notice its prior decisions in the matter, which include an [o]rder for summary judgment in a legal malpractice claim against Toscano in which the [c]ourt dismissed Haroldson's claims based, in part, on the lack of merit of his "case within the case." Based on the [c]ourt's conclusion that an offer of $125,000 was communicated to Toscano, and given the

> problematic nature of Haroldson's claims, the [c]ourt finds that Toscano made a significant contribution to the advancement of Haroldson's case.

The court held that Toscano was "entitled to the entire lien of $31,250.00." The court also "decline[d] to credit Haroldson's contention that Toscano unconditionally promised to refund the $15,000.00 retainer in the event of a settlement." The court then entered judgment in Toscano's favor for $31,250.

## II

### A. Jury Trial Issue

Haroldson contends the trial court erred by denying him a jury trial on the Toscano Firm's claim for an award of attorneys' fees for the work it performed before he retained Margeotes. We agree and hold that Haroldson was entitled to a jury trial on the attorney lien claim and the $15,000 retainer dispute.

Article I, Paragraph 9, of the New Jersey Constitution provides that "[t]he right of trial by jury shall remain inviolate[.]" This provision "guarantees the right to trial by jury as it existed at common law" in 1947 when the New Jersey Constitution was adopted. Ciba-Geigy Corp. v. Liberty Mut. Ins. Co., 149 N.J. 278, 291 (1997).

The right to a jury trial "attaches in legal, but not equitable actions." Id. at 291. The court must "look to the historical basis for the cause of action and

focus on the requested relief" to determine whether a case is primarily legal or equitable. Weinisch v. Sawyer, 123 N.J. 333, 343 (1991). See also Shaner v. Horizon BanCorp., 116 N.J. 433, 450-51 (1989) ("We consider the nature of the underlying controversy as well as the remedial relief sought in determining whether the cause of action has been historically primarily equitable or legal in nature."). Where litigants seek equitable relief rather than money damages, they "generally do not enjoy a right to trial by jury." Weinisch, 123 N.J. at 344. But "where the primary right is legal, and the remedy invoked is likewise legal in character, and there is an adequate, certain and complete remedy at law, equity will not exercise its jurisdiction." Pridmore v. Steneck, 122 N.J. Eq. 35, 37 (1937).

Here, the trial court correctly held that the Toscano Firm's claim for "fixing a lien pursuant to N.J.S.A. 2A:13-5" constituted a claim for quantum meruit, and we discern no dispute on that point. "An attorney hired on a contingent fee basis and later discharged before completion of services is not entitled to recover fees on the basis of such contingent agreement; instead, he or she may be entitled to recover on a quantum meruit basis for the reasonable value of the services rendered." Glick v. Barclays De Zoete Wedd, Inc., 300

31

N.J. Super. 299, 310 (App. Div. 1997) (citing <u>Cohen v. Radio-Electronics Officers Union</u>, 146 N.J. 140, 165 (1996)).

The trial court reasoned that the Toscano Firm 's statutory lien claim was an "essentially equitable proceeding" to which a right to trial by jury did not attach. As for Haroldson's remaining counterclaims and third-party claims, the court recognized that a jury trial right attached, and it empaneled a jury to hear evidence on those claims. However, because it feared inconsistent results on the jury's determination of the $15,000 retainer issue and its own decision on the quantum meruit claim, it made all findings and ruling as to both disputes without a jury. This constituted error, both in removing the $15,000 retainer dispute from the jury and deciding it as a breach of contract claim, and in holding that no jury trial right attached to the quantum meruit claim.

<u>Rule</u> 4:35-1(d) provides that, once a demand for a jury trial has been made, the case must be tried to a jury unless all parties consent otherwise or the court finds that no jury trial right exists. Specifically, the rule states:

> When trial by jury has been demanded as provided by this rule the trial of all issues so demanded shall be by jury, unless all parties or their attorneys, by written consent and filed stipulation or oral stipulation made in open court and entered on the record, consent to trial by the court without a jury, unless the court on a party's or its own motion finds that a right of trial by jury of some or all of those issues does not exist.

[Ibid.]

The trial court initially recognized that Haroldson's breach of contract and fraud claims should be tried to a jury, yet it removed the decision on the $15,000 retainer from the jury because it viewed this dispute as "inextricably tied to the issue of the fee under the fee lien" and it feared possible inconsistent results. This implied that the court did not view the $15,000 retainer dispute as a separate breach of contract claim, but as a payment issue subsumed within the lien claim. Had the court considered the $15,000 retainer payment in this way, then it would not have deprived Haroldson of his right to a jury trial on either a breach of contract or fraud claim because, when Haroldson's other claims were dismissed, the $15,000 retainer dispute became nothing more than an issue of payment or credit, not an independent cause of action.

However, in its decision, rather than treating the $15,000 retainer as credit, or finding that it raised issues "inextricably tied" to the lien claim, the trial court treated the retainer dispute as a breach of contract claim, wholly distinct from the lien claim. The court made credibility and fact findings regarding the promise Toscano allegedly made to Haroldson to return the retainer and found against Haroldson based solely on those findings. The court, however, treated these findings as unrelated to the value of the work the Toscano

33

Firm performed and the amount it was entitled to collect under the lien claim. The problem with the court's approach of treating the $15,000 retainer dispute as a breach of contract claim is that a jury trial right attached to that claim and, if that claim continued intact after Haroldson's other claims were dismissed, then under Rule 4:35 1(d), the court had no power to deprive Haroldson of a jury without his consent.

We also conclude the trial court incorrectly held that the quantum meruit claim was "essentially equitable." Although many cases describe quantum meruit as rooted in "equitable" principles, it is recognized as a legal remedy. Kopin v. Orange Prod., Inc., 297 N.J. Super. 353, 367 (App. Div. 1997) (finding quantum meruit "is actually a legal remedy, albeit one based on equitable principles."); Ballard v. Schoenberg, 224 N.J. Super. 661, 667 (App. Div. 1988) (noting that the defendant sought "specific performance, an equitable remedy, and damages in quantum meruit, a legal remedy," but holding that the denial of a jury trial caused no prejudice because the court never reached issue of quantum meruit).

Quantum meruit is a form of quasi-contract, and the phrase means "as much as [one] deserves." Kopin, 297 N.J. Super. at 367 (citation omitted). See also Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437-38 (1992) (finding

34

quantum meruit "entitles the performing party to recoup the reasonable value of services rendered.").  In <u>Glick</u>, we explained the proper analysis of a quantum meruit claim where an attorney has been discharged by the client:

> Because the proper measure of compensation under quantum meruit is as much as is deserved, the crucial factor in determining the amount of recovery is the contribution which the lawyer made to advancing the client's cause.  Thus, if a retiring lawyer cedes to his successor a substantially prepared case which resulted from an extensive investment of time, skill and funds, the retiring lawyer might be entitled to compensation greater than the standard hourly rate.  In comparison, if a ceding lawyer's work contributed to a recovery by the client, but the new attorney was crucial in the success of the case, then the predecessor's compensation should be based, at most, upon a standard hourly rate.  Finally, if the predecessor's work, no matter how extensive, contributed little or nothing to the case, then the ceding lawyer should receive little or no compensation.  Where the attorney is discharged for good cause, he or she may not be entitled to any recovery, except reimbursement of the reasonable costs incurred in the representation.
>
> [<u>Glick</u>, 300 N.J. Super. at 310-11 (citations omitted).]

N.J.S.A. 2A:13-5 gives the attorney "who shall appear in the cause for the party instituting the action . . . a lien for compensation, upon his client's action," and that lien "shall not be affected" by settlement of the action.  In construing the statute, first enacted in 1914, the Court of Errors and Appeals noted that it applied to both courts of law and courts of equity, depending on where the

35

underlying action was lodged. Artale v. Columbia Ins. Co., 109 N.J.L. 463, 465-66 (E. & A. 1932). The Artale court noted that courts of law and equity have jurisdiction to enforce an attorney's lien, and it suggested, as procedure in courts of law, that the dispute be "tried to a jury, or by the court if a jury be waived, or disposed of by the court where the facts are admitted." Id. at 468.

In 1959, we noted that the procedures suggested in Artale "have since been recognized as the proper procedure." H. & H. Ranch Homes, Inc. v. Smith, 54 N.J. Super. 347, 353 (App. Div. 1959). Justice, then Judge, Haneman explained:

> For the guidance of counsel in connection with future applications, consistent with the spirit of our present rules of practice, we suggest that, where the determination or enforcement of an attorney's lien is sought, the following procedure, patterned on Artale, be employed: The attorney should make application to the court, as a step in the proceeding of the main cause, by way of petition, which shall set forth the facts upon which he [or she] relies for the determination and enforcement of his alleged lien. The petition shall as well request the court to establish a schedule for further proceedings which shall include time limitations for the filing of an answer by defendants, the completion of pretrial discovery proceedings, the holding of a pretrial conference, and the trial. The court shall, by order, set a short day upon which it will consider the application for the establishment of a schedule. A copy of such order, together with a copy of the petition, shall be served upon defendants as directed by the court. The matter should thereafter proceed as a plenary suit and be tried either with or without a jury, in the Law Division, depending upon whether demand therefor has

been made, . . . or without a jury if the venue of the
main cause is laid in the Chancery Division.  In no event
should the matter be tried as a summary proceeding.

[Id. at 353–54 (emphasis added).]

See also Musikoff v. Jay Parrino's The Mint, LLC, 172 N.J. 133, 146 (2002)

("affirm[ing] the basic elements of the process articulated in H. & H., except

that we do not interpret the process to require an attorney to file and enforce a

lien petition prior to settlement or judgment in the underlying action.").

Both Haroldson and the Toscano Firm cite Martin v. Martin, 335 N.J.

Super. 212 (App. Div. 2000), in support of their positions.  Although it did not

address the point directly, on balance the Martin case supports the right to a jury

trial in a case like the one under review.  The Martin court states that an

attorneys' lien "is rooted in equitable considerations, and its enforcement is

within the equitable jurisdiction of the courts."  Id. at 252.  However, it explains

that "the procedures to be followed in effectuating the statute are rooted in dicta

set forth in Artale," and it quotes the explanation given by the H. & H. Ranch

court, including the discussion of trial by jury in the Law Division.  Id. at 222-

23.  Moreover, Martin concerned an appeal from a judgment of the Chancery

Division, so the absence of a jury trial in that case is consistent with the

expectation set out in Artale and H. & H. Ranch that claims in a court of

chancery will proceed without a jury while claims in a law court will be decided by a jury. Ibid.

The Toscano Firm argues "the parties stipulated verbally" at one point that "the fee action should be tried in a bench trial," and both the Toscano Firm's counsel and the court recalled a discussion about a year before trial that the fee action would be a bench trial. Counsel for Nicholson acknowledged that "there were discussions" between counsel in the months before trial as to "procedurally the best way to approach this"; however, he did not concede that there had ever been any stipulation, and insisted on Haroldson's right to a jury trial on all issues of fact and credibility. Regardless, Rule 4:35-1(d) expressly provides that consent to a bench trial where a jury trial right exists must be by "written consent and filed stipulation or oral stipulation made in open court and entered on the record." Haroldson's counsel never signed a written stipulation nor did he ever make such an oral stipulation in open court. To the contrary, he verbally demanded a jury on the record in open court. Accordingly, we conclude the trial court erred in denying Haroldson a jury trial on the lien claim and in its treatment of the $15,000 retainer dispute.

A-2909-17T2

B.  <u>Expert Opinion Issue</u>

Haroldson argues that the trial court erred in dismissing his legal malpractice claims on summary judgment, contending Wasserman's opinion was "not a net opinion" and "should have been credited" as to "proximate cause." He contends that "Wasserman's expert opinion is grounded in the factual record and the law for determining the standard of care of an attorney in a case for legal malpractice," and he argues that the issue of whether the Toscano Firm's and Toscano's actions "proximately caused" his damages was "one for the finder of fact" that should not have been decided on summary judgment. We find no error in the trial court's grant of partial summary judgment.

When deciding a summary judgment motion, the trial court must determine whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995); see also R. 4:46-2(c). The trial court must not decide issues of fact; it must only decide whether there are any such issues. Brill, 142 N.J. at 540. The reviewing court uses the same standard, first determining whether a genuine issue of fact exists, and then, if one does not, whether the trial court's ruling on the law was

correct.  Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div. 1998).

Contrary to Haroldson's contention, for purposes of the summary judgment motion, the trial court 1) did not hold that Wasserman offered net opinions, and 2) made all inferences in Haroldson's favor both as to deviations from the standard of care and as to proximate cause, crediting that Wasserman's opinions could establish a prima facie case on those points.  Rather, the trial court held that, even assuming that Wasserman's testimony could establish deviation from a standard of care and causation, Haroldson presented no proofs from which a jury could determine the extent of his damages.

First, the court cited the legal standard for proving damages in a legal malpractice claim:

> [T]o prove such injury, "the client must demonstrate that he or she would have prevailed, or would have won materially more . . . but for the alleged substandard performance." Lerner v. Laufer, 359 N.J. Super. 201, 221 (App. Div.), certif. denied, 77 N.J. 223 (2003).  The measure of damages is ordinarily what the client would have obtained without the attorney's negligence. Garcia v. Kozlov, Seaton, Romanini & Brooks, P.C., 179 N.J. 343, 358 (2004).

Next, the court noted that Wasserman's opinion was that Toscano's various failures to properly prosecute the CEPA case caused Haroldson "to lose the full

value of his claim and accept a settlement at a drastic discount or in the alternative, face the prospect of proceeding to trial without proper preparation." The court held that this was not sufficient to establish the element of damages, explaining:

> Wasserman's conclusion is clear: Toscano's alleged deviations from the standard of care caused Haroldson to accept a settlement below its true value. However, what is glaringly absent is any expert estimation of the case's fair settlement value. While [Haroldson's economic expert] estimated that Haroldson's economic losses were $108,000, there was no expert testimony as to what the appropriate settlement figure would have been. Haroldson does not even attempt to address this requirement. Without establishing the damage of Toscano's alleged malpractice, Haroldson's malpractice case clearly fails.

Haroldson does not dispute that Wasserman failed to quantify the diminution of value of the CEPA case due to alleged deviations from the standard of care. Nor does he contend there was other expert testimony or evidence from which a finder of fact could have determined that the CEPA case would likely have provided Haroldson with some measurable amount in excess of the $200,000 settlement he ultimately received. Without such evidence, Haroldson failed to sustain the burden of showing the damages he claims were caused by Toscano's deviations from the standard of care in representing him.

41

Moreover, Haroldson's reference to a "net opinion" ruling is misplaced, as the trial court made no such ruling in determining that Wasserman's opinions were insufficient to defeat summary judgment on the legal malpractice claim. Rather, later in the case, the court considered whether Wasserman would be permitted to testify in support of the remaining causes of action, specifically Haroldson's claims that behavior by Toscano after the Toscano Firm was discharged constituted breach of a fiduciary duty and intentional attorney misconduct.

Wasserman had opined that, after Haroldson left the Toscano Firm for Margeotes, Toscano acted improperly in various ways in connection with his post-discharge fee application. However, the court held that Wasserman did not explain the appropriate standard of care for an attorney's conduct after the conclusion of the underlying case, so his opinions on that point were net opinions. It stated:

> So, I'm not going to permit Mr. Wasserman to come in and give a disposition on these post-discharge issues when his report merely calls it a – calls it a deviation, but doesn't comply in my opinion with the law and set forth how and why it's a deviation or identify the standard – identify where the standard comes from. So, it's – his mere statements along those lines are not enough.

A-2909-17T2

On appeal, Haroldson asserts that the court erred in its treatment of Wasserman's opinions in connection with the legal malpractice claims, but he does not assert that the court erred by precluding Wasserman's testimony as to his claims based on Toscano's post-discharge conduct. Indeed, Haroldson does not argue on appeal that the court erred in dismissing the post-discharge-related claims. Therefore, the court's ruling that Wasserman's opinions on post-discharge conduct were net opinions is irrelevant here.

Regarding the court's grant of summary judgment on the legal malpractice claim, we find the court did not err in its consideration of Wasserman's opinions or in its determination that Haroldson failed to offer sufficient proof to enable the jury to determine damages.

C. Frivolous Litigation Issue

Haroldson asserts that the trial court erred in denying his motion under the frivolous litigation rule for sanctions against Toscano for having filed the fourth-party complaint in June 2014 and for having moved to file an amended fourth-party complaint in December 2014. We hold the trial court acted within its discretion in denying sanctions.

Conditioned on the moving party providing the appropriate notice, Rule 1:4-8 permits the trial court to grant a motion imposing sanctions for an

adversary's filing a frivolous pleading where the attorney acts with an improper purpose, asserts claims without a legitimate basis in law or a "non-frivolous argument" for the extension or modification of the law, or alleges facts that cannot be supported. A trial court's denial of a motion for sanctions under Rule 1:4-8 is reviewed for abuse of discretion. K.D. v. Bozarth, 313 N.J. Super. 561, 573 (App. Div. 1998).

"Sanctions are not to be issued lightly; they are reserved for particular instances where a party's pleading is found to be 'completely untenable,' or where 'no rational argument can be advanced in its support.'" McDaniel v. Man Wai Lee, 419 N.J. Super. 482, 499 (App. Div. 2011) (quoting United Hearts, L.L.C. v. Zahabian, 407 N.J. Super. 379, 389 (App. Div. 2009)). The court can order the offending attorney to pay a penalty to the court or to pay some or all of the moving party's attorney's fees, but in either case the sanction "shall be limited to a sum sufficient to deter repetition of" the improper conduct. R. 1:4-8(d).

Here, the trial court denied the sanctions motion for two reasons: 1) untimeliness, and 2) the absence of bad faith or knowingly false allegations. On the issue of timeliness, the court erred in holding that Rule 1:4-8 required the motion to be filed within twenty days of August 25, 2017, the date it decided

the fee issue. Final judgment in this case did not occur until January 29, 2018, when the court entered an order dismissing Haroldson's counterclaim and third-party complaint. Haroldson's sanctions motion was filed three months prior to the entry of this order, so it was within the deadline imposed by Rule 1:4-8.

Nevertheless, it bears noting that Haroldson waited twenty months from the date of the court's denial of the motion to file an amended fourth-party complaint to seek sanctions connected with that allegedly frivolous pleading. Although the sanctions motion was not untimely under the rule, the court could have reasonably believed that, with trial over and no efforts by Toscano to push the claims in the fourth-party complaint for twenty months, sanctions were not necessary "to deter repetition of" the conduct at issue. R. 1:4-8(d).

Haroldson contends that Toscano "simply copied causes of action out of Bannon's Encyclopedia of New Jersey Causes of Action without reading the cases or statutes they are based upon," and essentially argues that doing this rendered the fourth-party complaint frivolous as a matter of law. The fourth-party complaint asserted sixteen causes of action, including frivolous litigation, intentional interference with contract, "false complaint of unprofessional conduct," defamation, and wrongful use of process.

The overall pleading, as noted by the court when it denied Haroldson's initial motion to dismiss, "as drawn seems to be a little convoluted." It does not follow, however, that Toscano's efforts to assert any fourth-party claims were necessarily frivolous. Although the pleading is rife with hyperbole and accusations of bad faith and nefarious intent, its essential factual underpinnings are accurate. Haroldson retained Margeotes rather than continue with the Toscano Firm in the CEPA case, Margeotes settled the dispute less than three weeks later, and Haroldson thereafter refused to pay attorneys' fees to Toscano and the Toscano Firm for any work performed. The trial court could reasonably have concluded from this that Toscano did not act in bad faith or knowingly allege false facts.

Haroldson stresses that, upon close inspection, the fourth-party complaint failed to state a claim upon which relief could be granted. We agree. For this reason, the trial court dismissed the fourth-party complaint and denied Toscano's motion to file an amended fourth-party complaint without material changes. However, not every complaint that fails to state a claim is frivolous.

Haroldson suggests that the trial court misunderstood the nature of his sanctions motion, stating that the court "erred to the extent it concluded that" the motion "was directed at [p]laintiff's [m]otion seeking [e]nhanced [f]ees,"

rather than the motion to file the amended fourth-party complaint. However, Toscano sought enhanced fees in the fourth-party complaint, as well as other relief, and Haroldson contended that the inclusion of this requested relief, which was made after the Toscano Firm 's motion for enhanced fees had already been denied, was affirmative evidence of an "improper purpose." In this context, the court's refusal to find that Toscano "had no good-faith belief in his motion for enhanced fees" simply addressed one of Haroldson's arguments and did not suggest a misunderstanding on the part of the trial court. We conclude the trial court acted within its discretion in refusing to impose sanctions for frivolous litigation.

D. <u>Emails and Recordings</u>

Haroldson argues that the trial court erred 1) in finding that two emails had been inadvertently sent by Toscano and should have been returned in accordance with RPC 4.4(b), and (2) in denying access to the recordings of certain recesses during the May 2016 trial that ended in a mistrial. We disagree, and find that the trial court acted within its discretion in ruling on these issues.

Even assuming that the trial court erred in any determination regarding the emails and the recordings, any such error was harmless. Under the harmless error doctrine, "[a]ny error or omission shall be disregarded . . . unless it is of

A-2909-17T2

such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10–2.  See also State v. Macon, 57 N.J. 325, 338 (1971) (an appellate court must determine "whether in all the circumstances there was a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits."); Feiler v. N.J. Dental Ass'n, 199 N.J. Super. 363, 366 (App. Div. 1984) (an error is harmless if it is "not 'clearly capable of producing an unjust result' within the intendment of R. 2:10–2.").

On appeal, Haroldson does not explain how a different decision by the trial court on these points could have impacted the disposition of the matter in any way.  Indeed, Haroldson did not seek to admit either the emails or the recordings as evidence on any claim or defense presented to the judge or the jury, and the ultimate admissibility of both remains questionable.

Haroldson's counsel received the emails at issue as part of discovery in October 2014, yet they were not offered as evidence at trial in 2016 or 2017. The existence of the emails was not raised until after trial in 2017, and then only in connection with Roper's insinuation that the State was resisting her ongoing efforts to obtain court recess recordings out of improper favoritism toward Toscano.  On appeal, Haroldson argues that the emails "demonstrate Toscano's pattern of intimidation and braggadocio" that he engaged in when attempting to

collect fees post-discharge. The claims based on post-discharge conduct, however, were dismissed by the court, and Haroldson does not contest that decision on appeal. Evidence of pre-discharge intimidation and braggadocio could, perhaps, be relevant to the issue of the quality of the Toscano Firm's services in the fee dispute, but it would no longer be relevant to anything else.

As for the recordings, while they were not actually in Haroldson's possession prior to trial, his counsel knew of their existence but did not proffer them as evidence on any material point. In connection with seeking the recordings after the completion of the trial, Haroldson's counsel stated they were relevant to "impugn the credibility of Mr. Toscano in the context of his pending claim for attorneys' fees." However, the recordings concerned alleged inappropriate statements made by Toscano nearly three years after the Toscano Firm's services were terminated, which would not serve to impugn his credibility on the issue of the nature and sufficiency of the services the Toscano Firm rendered.

We find no error in the trial court's determination that the email exhibits were privileged and produced inadvertently. In addition, if any error occurred, we find that any such error was harmless.

A-2909-17T2

Any arguments not specifically addressed lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed in part and reversed and remanded, in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION